UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:11-CV-00044-F

BEACH MART, INC.,                               )
                    Plaintiff                   )
                                                )
        v.                                      )
                                                )
L&L WINGS, INC.,                                )
                    Defendant.                  )
_____          )
                                                )
                                                )
L&L WINGS, INC.,                                )
        Counterclaimant                         )
                                                )          ORDER
        v.                                      )
                                                )
BEACH MART, INC.,                               )
        Counter Defendant.                      )


L&L WINGS, INC.,                                )
                    Plaintiff                   )
                                                )
        v.                                      )
                                                )
SHEPARD MORROW, SUPER WINGS, LLC,               )
and BEACH MART, INC.,                           )
                    Defendants.                 )


        This matter comes before the court on Beach Mart's motion for sanctions [DE-165]. The

matter is fully briefed and is now ripe for disposition. For the reasons stated below, the motion is

ALLOWED.

## INTRODUCTION

        What was once primarily a case about breach of contract and trademark infringement has,

after an Amended Complaint by Beach Mart, transformed into a case about fraudulent

inducement to contract and negligent misrepresentation. The primary source of that change—and of this motion for sanctions—is the discovery of a trademark licensing agreement between L&L and Morrow (the "Morrow agreement"). In the agreement, Morrow, as owner of the Wings trademark, grants L&L a license to use the Wings trademark in L&L's retail stores. *See* Morrow License [DE-166-5] at 1. Moreover, L&L acknowledges Morrow as the owner of "all right, title and interest" in the Wings trademark. *Id.* Thus, the Morrow Agreement places in doubt—to a degree yet to be determined—the rightful ownership of the Wings trademark. Ownership of the Wings trademark has been and will continue to be a fundamental issue in this litigation.

Of more importance to the present motion is how Beach Mart came to discover the Morrow Agreement and several other undisclosed licensing agreements between L&L and third parties (jointly, the "undisclosed agreements"). Beach Mart has accused L&L of intentionally withholding the undisclosed agreements throughout discovery and now seeks sanctions for L&L's discovery violations.

## RELEVANT BACKGROUND

When discovery began in this action, Beach Mart cast a wide net for all documents relating to the license and use of the term Wings, including "executed licenses or assignments, and/or other agreements." *See* Beach Mart's First Reqs. Produc. [DE-160-3] at 13. Beach Mart also asked for documents relating to any settlement between L&L and third parties involving any alleged infringement of L&L's Wings trademark. *Id.* at 21. Put simply, Beach Mart wanted, *inter alia*, every document L&L had relating to Wings trademark licenses. L&L responded to Beach Mart's requests with boilerplate objections, but otherwise agreed to produce documents in its possession regarding any licenses or permissions "provided by [L&L] to Beach Mart to use

2

'Wings' in any form," as well as documents showing the "resolution of actions taken by [L&L] to enforce and protect [its Wings trademark]." L&L's Resp. First Reqs. [DE-166-7] at 28, 45.

As discovery continued, Beach Mart focused its search. Beach Mart's second set of document requests asked L&L more specifically for every agreement granting anyone a license to use the Wings trademark regardless of whether those agreements were still in force. *See* Beach Mart's Second Reqs. Produc. [DE-160-2] at 2.[1] L&L responded by simply incorporating its previous responses. L&L's Resp. Second Reqs. [DE-166-9] at 7.

## A.     The Rule 30(b)(6) Deposition of Shaul Levy

Beach Mart later noticed a Rule 30(b)(6) deposition of L&L. *See* Rule 30(b)(6) Dep. Notice [DE-166-15]. As part of that notice, Beach Mart wanted to depose L&L regarding "[r]equests, discussions, or negotiations between L&L . . . or any other third party concerning any consent, authorization, license and/or permission to use [L&L's Wings trademark] or the term 'Wings.'" *Id.* at 3 (Schedule A). L&L again made boilerplate objections but also asserted a specific limitation: it would designate a representative to testify concerning "any consent, authorization, license and/or permission provided *by Wings to Beach Mart* to use 'Wings' in any form." L&L's Objections 30(b)(6) Dep. Notice [DE-166-17] at 5 (emphasis added). L&L designated Shaul Levy, L&L's founder and president, as its Rule 30(b)(6) witness. *See* First Levy Dep. [DE-166-10].

During Levy's May 2, 2012 deposition, Levy was asked "[h]ow many different people or companies have ever had a license to use the Wings trademark?" *Id.* at 279:9-11. Even though this question probed an area of discussion to which L&L had previously objected, Levy answered and named five parties with whom L&L had entered into agreements to use the Wings

---

[1] The exact language of the request can be read even more broadly than this paraphrasing.

trademark: Tim Anglim, Raffi and Effi Benjamin, Eli Tabib, Brian Bates,[2] and Zeev Tafel. *Id.* at 279:9-281:15. Levy later seemed to correct himself, asserting that Anglim never had a license to use the Wings name, but instead had only a license to use *Winds*. *Id.* at 284:12-19 ("[H]e never had Wings, he had Winds with the D.").[3] However, as Beach Mart would soon discover, that statement was unequivocally false.

Levy did not disclose any further Wings licensing agreements. Indeed, L&L's counsel had previously said that L&L had provided all documents responsive to Request Number 1 of Beach Mart's Second Set of Requests. *See* Letter from J. Schouten [DE-166-12]. Request Number 1 sought every agreement granting anyone a license to use the Wings trademark, regardless of whether currently in force or otherwise. *See* Beach Mart's Second Set Reqs. Produc. [DE-160-2] at 2. Moreover, during the Levy deposition, Mr. Bennett Krasner, one of L&L's attorneys, affirmed that L&L "endeavored to give [Beach Mart] all of the documents as [shown] by the sheer number of documents." First Levy Dep. [DE-166-10] at 288:18-20. While this statement was made during a discussion of the Benjamin agreement, the statement indicates a volume of disclosure that surpasses a single agreement. *See id.* at 287:23-289:12.

Following Levy's deposition, Beach Mart moved to amend its answer to add a defense of unintentional trademark abandonment [DE-42]. After much consideration, this court granted the motion [DE-129]. But by that point discovery had already closed, and Beach Mart had to move to reopen discovery [DE-137]. That motion was also granted [DE-142]. Beach Mart anticipated using this new discovery period to find support for its trademark abandonment defense, primarily

---

[2] Bates had a verbal licensing agreement with L&L, though the record is unclear on the duration of that agreement.
[3] The Anglim *Winds* agreement was signed by Levy on October 25, 1995. 1993 Anglim Sublicense [DE-166-3] at 15.

through depositions of Wings licensees. But Beach Mart soon found a document of potentially greater impact—a Wings licensing agreement where L&L was not the licensor, but the *licensee*.

**B.      The Anglim Deposition and the Discovery of Undisclosed Licenses**

During When Beach Mart deposed Anglim, he told Beach Mart that he had a *Wings* agreement in addition to the Winds agreement. *See* Anglim Dep. [DE-166-14] at 19:22-20:21. Even though Levy had specifically stated that Anglim never had a Wings licensing agreement, Anglim's copy of the agreement showed that Levy had signed the Anglim Wings agreement on February 1, 1993—just two and a half years before he signed the Anglim Winds agreement. 1993 Anglim Sublicense [DE-166-3]. Indeed, the Wings agreement ran up until the time Anglim and Levy signed the Winds agreement; Anglim had wanted to create his own identity separate from the Wings trademark and found it opportune to do so in 1995 with the name Winds. Anglim Dep. [DE-166-14] at 21:20-22:16.

The most interesting aspect of the Anglim Wings agreement was not its existence, but that it was a *sub*licensing agreement. The agreement stated that L&L was only a sublicensor of the Wings trademark with Morrow being the actual owner. 1993 Anglim Sublicense [DE-166-3]. Moreover, attached to the Anglim Wings sublicense was the original Morrow agreement granting L&L a license in the Wings trademark. *See id.* at 6-11. Up to this point, Beach Mart had acted on the assumption that L&L was the rightful owner of the Wings trademark: Beach Mart's claims and defenses were premised on this assumption, and its discovery, while casting a sufficiently wide net to catch the Morrow agreement, had been focused on discovering the extent of L&L's control over the Wings trademark.

Beach Mart eventually discovered two other Wings licensing agreements, one verbal (with Rosenberg) and one written. The written agreement was entered into by L&L and Mr. Etsion Yacobi on May 18, 2001, and accompanied a sublease between the two parties for a Wings store location. 2001 Yacobi Sublicense [DE-166-4] at 10-17 (Sublease), 18-26 (Licensing Agreement). L&L had sued Yacobi over the sublease in 2007 and had attached the Wings agreement as an exhibit to the Complaint. *See* 2008 Yacobi Litig. Report & Compl. [DE-176-4] at 4, 50-58 (Exhibit D). Thus, as of 2008, L&L and its attorneys evidently had a copy of the Yacobi licensing agreement.

Now equipped with the newly discovered evidence—four licensing agreements, including the Morrow agreement—Beach Mart noticed a second Rule 30(b)(6) deposition. Second Levy Dep. [DE-166-18]. At this second deposition, Levy testified at length concerning the previously undisclosed agreements.[4]

After the second Levy deposition, Beach Mart moved to continue the trial scheduled for September 30, 2013 [DE-156]. Beach Mart then followed up with motions for leave to file an amended complaint [DE-163], and the instant motion for sanctions [DE-165]. The court continued the trial and granted the motion leave to file an amended complaint.

## C.  Discovery of a Box Containing Previously Undisclosed Agreements

Meanwhile, L&L prepared its response to Beach Mart's motion for sanctions. As part of that preparation, L&L prepared an affidavit for Ms. Nancy Cibrano, an L&L employee "responsible for, among other things, the retention and storage of L&L's corporate documents." Decl. Nancy Cibrano [DE-171-2] ¶ 5. In her affidavit, Cibrano states that she conducted two

---

[4] The parties disagree as to the source of Levy's reinvigorated memory: Beach Mart claims that Levy knew of the documents all along; L&L claims that the discovery of the documents refreshed Levy's memory.

previous searches for documents in response to Beach Mart's requests for production. *Id.* ¶¶ 9-11. According to Cibrano, those searches covered the only two areas where L&L kept corporate documents—the second floor of L&L's corporate headquarters and the subbasement storage area. *Id.* ¶¶ 7, 9, 11. In both instances, Cibrano states that she did not limit her search in any way based on "the objections interposed by L&L's attorneys," and that her second search specifically sought "license agreements between L&L and third parties." *Id.* ¶¶ 10.

According to Cibrano, the first search did not reveal any of the undisclosed agreements, while the second search did not yield any "additional" licenses. *Id.* at ¶¶ 10-11. However, after Beach Mart filed its motion for sanctions, Cibrano conducted a third search for the missing documents. *Id.* ¶ 12. During that search, Cibrano states that she asked "one of the building's handymen if he was aware of any other part of the subbasement where there might be records." *Id.* ¶ 13. Then came the moment of discovery—the handyman told Cibrano that "there was a box among the old furniture and fixtures on the lowest shelf of a cabinet, which was in an area of the subbasement that is separate and across from the document storage area." *Id.* As Cibrano opened the box, she saw files with the names Rosenberg and Morrow. *Id.* Two days later, L&L's counsel sent a letter to Beach Mart, informing Beach Mart of the discovery. Attached to the letter was a document confirming the Rosenberg agreement; however, counsel refused to produce a copy of the discovered Morrow agreement because Beach Mart had already obtained the document. *See* Letter from D. Eglinton [DE-176-1]. Despite L&L's assertions that it had no further responsive documents in its possession, L&L had, at very least, the Morrow agreement and evidence of the Rosenberg agreement.

**D.     The Parties' Actions Until the Present**

Nearly a month after the discovery of the box of documents, this court held a hearing on Beach Mart's motion for leave to file an amended complaint [DE-163]. During the hearing, the parties expressed interest in further settlement negotiations, which the court strongly encouraged in its order following the hearing. *See* December 16, 2013 Order [DE-183] at 8 ("The court strongly encourages the parties to settle this case, as the parties are not directly competing with each other and it will conserve significant costs to the parties if this case can settle."). To encourage a focus on settlement, the court placed a stay on all motions practice until the parties engaged in good faith efforts towards settlement. *Id.* However, during that stay both parties engaged in activities that would shore up their litigation positions once the court reopened motions practice.

Beach Mart filed its amended complaint on the same day the court gave its order granting leave to file the amended complaint [DE-184]. The nature of Beach Mart's claims had so changed that the case would essentially start anew after the parties failed to reach a settlement agreement. Meanwhile, Beach Mart also formed Super Wings, a new entity whose sole shareholder is Beach Mart's principal, Israel Golasa. After Super Wings's formation, Morrow assigned all of his right, title, and interest in the Wings trademark (whatever that might be) to Super Wings.

Minutes before the February 11, 2014 settlement conference before this court, L&L served a complaint and summons on Beach Mart for an action filed in the United States District Court for the Southern District of New York. *See* 1:14-CV-00809-GBD [DE-2]. In that action, L&L sought, *inter alia*, a declaratory judgment that Morrow had no remaining rights in the

8

Wings name and that the Morrow agreement with L&L terminated in 1994. *Id.* at 9-10. As an extension of those claims, L&L also challenged the assignment of Morrow's rights to Super Wings because, according to L&L's arguments, no rights existed. *Id.* at 10.

When this court reopened motions practice, Beach Mart immediately moved to enjoin L&L from prosecuting the New York action [DE-191]. L&L countered and moved to stay this case pending resolution of that action [DE-198]. This court issued an order in favor of L&L based on concerns (1) that the court would be unable to obtain jurisdiction over Morrow, (2) that deciding Morrow's rights was necessary to reaching a resolution in the present action, and (3) that the present action and the New York action were sufficiently distinct that the New York action could continue forward. *See* April 7, 2014 Order [DE-211] at 9-10. The action was transferred to the Southern District of New York. However, Morrow later consented to jurisdiction and the case was transferred back to this court. Now, Beach Mart and L&L are again before this court, and this motion is ripe for ruling.

## DISCUSSION

Beach Mart's motion for sanctions is based primarily on three of L&L's alleged discovery violations: (1) L&L's failure to disclose the Morrow agreement and other undisclosed licensing agreements in its responses to Beach Mart's requests for production of documents; (2) the failure of L&L's founder and Rule 30(b)(6) witness, Shaul Levy, to disclose the existence of the undisclosed licensing agreements in his deposition; and (3) L&L's failure to supplement its requests for production once Beach Mart began discovering the existence of the undisclosed agreements. Whether to impose discovery sanctions lies within the wide discretion of the court. *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003).

9

The court has various tools at its disposal in exercising this discretion, including the Federal Rules of Civil Procedure and the court's inherent powers.

## A.    The Court's Power to Sanction

### 1.  Under the Rules

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged mater that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The rules are to be given a "broad and liberal treatment." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). "Parties must respond truthfully, fully, and completely to discovery or explain truthfully, fully, and completely why they cannot respond." *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010). "The rules of discovery were not designed to encourage procedural gamesmanship, with lawyers seizing upon mistakes made by their counterparts in order to gain some advantage." *See Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988); *Mainstreet Collection*, 270 F.R.D. at 240. Indeed, Rule 26(g) imposes an "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purpose[] of Rules 26 through 37." Fed. R. Civ. P. 26(g), Advisory Committee's Notes (1983 Amendment). That spirit is to "expose the facts and illuminate the issues." *Id.*

In order to expose and illuminate the facts, discovery requests "should not be read or interpreted in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request." Fed. R. Civ. P. 37, Advisory Committee's Notes (1993 Amendments). Neither should parties craft objections to requests for production of

documents or to noticed topics of Rule 30(b)(6) depositions so as to avoid disclosure. *Id.*[5] Indeed, the Rules do not offer any "rule that permits a party to withhold plainly relevant information that directly contradicts its assertions in the hopes that the Court will be duped by the misleading arguments." *Rottlund Co. v. Pinnacle Corp.*, 222 F.R.D. 362, 378-79 (D. Minn. 2004) *report and recommendation adopted in part, rejected in part*, No. Civ.01-1980 DSD/SRN, 2005 WL 407860 (D. Minn. Feb. 17, 2005). A party who acts otherwise may be appropriately sanctioned under Rule 37. Fed. R. Civ. P. 37, Advisory Committee's Notes (1993 Amendments).

### 2. Under The Court's Inherent Power

Beyond courts' power to sanction under the Rules, federal courts also have the inherent power to impose sanctions on parties who abuse the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Courts can dismiss a lawsuit or make determinations of fact where discovery violations have been sufficiently severe. *Id.* at 45. In less severe situations, courts can award lesser sanctions, such as attorney's fees. *Id.* However, where the Federal Rules of Civil Procedure already provide for adequate sanctions, courts should first rely on the Rules before exercising their inherent powers. The inherent power then remains to "fill in the interstices" not covered by the Rules. *Id.* at 46.

Courts must exercise their inherent powers "with restraint and discretion." *Id.* at 44. Discretion includes crafting a sanction appropriate to remedy the harm caused by a party's abuse of the judicial process. *Id.* at 44-45. As an example, monetary sanctions "must be designed to compensate the complaining party . . . for losses . . . incurred as a result of the violation of the

---

[5] This is in keeping with a subdivision of Rule 37 that treats "an evasive or incomplete disclosure, answer, or response . . . as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

discovery duty." *Buffington v. Baltimore Cnty., Md.*, 913 F.2d 113, 135 (4th Cir. 1990). Generally, courts do not grant attorney's fees under their inherent power because of the "American Rule."[6]  But the rule does have its exceptions.  Those exceptions include (1) where there has been "willful disobedience of a court order," and (2) "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Chambers*, 501 U.S. at 45-46 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).  However, some courts have also held that "sanctions for a violation of Rule 26(e) may be imposed under the court's inherent power even though no order compelling the discovery was violated." *Buffington*, 913 F.2d at 135.

## B.    Levy's Rule 30(b)(6) Deposition

Having briefly considered the court's power to sanction, the court now turns to the first and most egregious of L&L's discovery violations:  Levy's testimony during his Rule 30(b)(6) deposition.  The court will first address L&L's arguments regarding its objections to the Rule 30(b)(6) deposition notice before considering Levy's testimony.

Rule 30(b)(6) of the Federal Rules of Civil Procedure allows a party to name a corporation as a deponent.  The named corporation must then designate a witness or witnesses to testify on its behalf, and those witnesses must testify about information "known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  If the designated witness does not have personal knowledge of the deposition topics, the corporation must prepare the witness to give "knowledgeable and binding answers for the corporation."  *United States v. Taylor*, 166 F.R.D.

---

[6] The American Rule provides "that the prevailing party must bear his own attorney's fees and cannot have them assessed against the loser."  *Chambers*, 501 U.S. at 59.

356, 361 *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996). Thus, a Rule 30(b)(6) witness must be prepared to testify beyond matters in which the witness was personally involved. *Id.*

The proper procedure to object to a Rule 30(b)(6) deposition notice is not to serve objections on the opposing party, but to move for a protective order. *Robinson v. Quicken Loans, Inc.*, No. 3:12-cv-00981, 2013 WL 1776100, at *3 (S.D. W.Va. Apr. 25, 2013). "Put simply and clearly, absent agreement, a party who for one reason or another does not wish to comply with a notice of deposition must seek a protective order." *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 242 F.R.D. 164, 166 (D. Mass. 2007). Once the deposition notice is served, "the corporation bears the burden of demonstrating *to the court* that the notice is objectionable or insufficient." *Robinson*, 2013 WL 1776100, at *3 (emphasis in original). If the corporation makes no such showing, the corporation must produce a witness prepared to testify to the subject matter described in the notice. *Id.* The corporation cannot make its objections and then provide a witness that will testify only within the scope of its objections. *Id.*

### 1. L&L's Objections to Beach Mart's Rule 30(b)(6) Deposition Notice

Beach Mart served L&L with a Rule 30(b)(6) deposition notice that included the topic, "Requests, discussions, or negotiations between L&L, Beach Mart, . . . or any other third party concerning any consent, authorization, license and/or permission to use [L&L's Wings trademark] or the term 'Wings.'" Rule 30(b)(6) Dep. Notice [DE-166-15] at Schedule A, p.3. L&L designated Shaul Levy as its Rule 30(b)(6) witness, *see* First Levy Dep. [DE-166-10], but objected to the scope of Beach Mart's deposition notice, *see* L&L's Objections 30(b)(6) Dep. Notice [DE-166-17]. Specifically, L&L attempted to limit the scope of Category 8 to "any

consent, authorization, license and/or permission provided *by Wings to Beach Mart* to use

'Wings' in any form." *Id.* at 5 (emphasis added). While L&L's suggested scope would

eliminate any discussion covering the undisclosed agreements, L&L never moved for a

protective order. Instead, L&L "file[d] objections and then state[d] that it [would] only produce

general answers to the topics in accordance with its objections." *Espy v. Mformation Techs.,*

*Inc.*, No. 08-2211-EFM-DWB, 2010 WL 1488555, at *3 (D. Kan. Apr. 13, 2010). L&L's

actions were improper and entitle it to no protection from sanctions based on its objections to the

Rule 30(b)(6) deposition notice. L&L's objections exhibit exactly the type of technical

objection-crafting the Rules seek to deter and for which Rule 37 sanctions were created. *See*

Fed. R. Civ. P. 37, Advisory Committee's Notes (1993 Amendments).

      Furthermore, even were L&L to have properly objected to the notice or moved for a

protective order, it would have waived its objections to Category 8 when Levy began to testify

concerning parties to whom L&L had given licenses to use the Wings trademark. During Levy's

deposition, Beach Mart's counsel asked Levy, "How many different people or companies have

ever had a license to use the Wings trademark?" First Levy Dep. [DE-166-10] at 279:9-11.

Levy then named five parties with whom L&L had a license to use the Wings trademark. *Id.* at

279:12-281:15. He went on to speak at great length about these parties and the agreements.

      L&L contends that Levy spoke only in his personal capacity when he spoke on topics to

which L&L had previously objected. In support, L&L cites to *Moore's Federal Practice*

§ 30.25[4] (3d ed. 2013). However, a closer reading of that text undermines L&L's arguments in

three ways. First, *Moore's* addresses what might happen when a Rule 30(b)(6) witness speaks

outside the bounds of the *notice*, not what happens when the witness speaks outside the scope of

14

the objections.  *Id.*  Second, the authorities cited by *Moore's* merely provide different ways that courts have handled such situations—these are prudential guidelines, not rules of law.  The method suggested by L&L is only one of several such potential methods.  *See id.*  Third, all of the methods suggested by *Moore's* require that counsel, before allowing the witness to answer, note on the record that the question is beyond the scope of the deposition notice.  *Id.*  In this case, no such objection was made.  Even if L&L were entitled to some protection based on its objections to Category 8, L&L would have waived that protection once Levy began to testify concerning the licensing agreements.[7]

### 2. Levy's Faulty Memory and False Assertions

Having disposed of L&L's arguments regarding its objections to Beach Mart's Rule 30(b)(6) deposition notice, the court turns to L&L's most egregious discovery conduct—Levy's Rule 30(b)(6) testimony.

During Levy's first deposition, he listed several parties with whom L&L had licensing agreements to use the Wings trademark.  First Levy Dep. [DE-166-10] at 279:12-281:15.  Levy initially listed Anglim as such a party and began to testify about the Anglim agreement. However, there was some confusion as to whether he was using the word *Winds* or *Wings*. L&L's counsel sought to clarify Levy's testimony and asked, "Just so we are clear here for the record, are you saying [Anglim] still has the right to use Wings or Winds?"  *Id.* at 284:12-15.  At this point, Levy asserted that Anglim *never* had a Wings license.  *Id.* at 284:16-19 ("[H]e never had Wings, he had Winds with the D.").  This statement was unequivocally false.

---

[7]  The court does not sanction L&L for its objections or its failure to move for a protective order.  Those objections simply do not offer L&L any protection against sanctions.

L&L claims that Levy merely forgot about the Anglim agreement because nearly twenty years had elapsed between the execution of the agreement and Levy's testimony. The same excuse is used for Levy's inability to testify concerning the other undisclosed agreements. L&L further claims that Levy, during his second deposition, was able to testify at length regarding the undisclosed agreements because the discovery of those documents refreshed his memory. The court does not accept these arguments as credible.

The proverbial thread that unravels Levy's cloak is Anglim. The court cannot accept that Levy could thoroughly remember the Anglim Winds agreement but not the more problematic Anglim Wings agreement where

    (a) he signed both agreements;
    (b) the agreements were executed only a little more than two years apart;
    (c) the Wings agreement lasted up until the Winds agreement was executed; and
    (d) Levy specifically asserted that Anglim never had a Wings agreement.

The last fact undercuts L&L's argument that Levy's memory was refreshed by the influx of newly discovered documents—if the new documents refreshed Levy's memory, why did his specific disavowal of the Anglim Wings agreement not refresh his memory? What the facts instead imply is that Levy wanted to avoid the Anglim Wings agreement.

Levy's desire to avoid the Anglim Wings agreement is understandable: the Anglim Wings agreement specifically references the Morrow agreement and states that L&L was *not* the Licensor of the Wings trademark, but rather that L&L was a Sublicensor of Morrow. 1993 Anglim Sublicense [DE-166-3] at 2-3. L&L contends that the Morrow agreement did not matter given that Beach Mart was focusing its license agreement discovery efforts on a "flawed abandonment defense," which could only be based on licenses L&L gave rather than received. L&L's Mem. Opp'n Beach Mart's Mot. Sanctions [DE-171] at 12. This argument misses the

mark.  The Morrow agreement, though doing little for L&L's abandonment defense, opened the door to a host of new defenses and claims, as shown by Beach Mart's amended complaint.  The court does not address the merits of these claims and defenses at this time, but the Morrow agreement has at very least cast a shadow, to an extent to be determined, on L&L's claims of rightful ownership over the Wings trademark.  Regardless of its ultimate impact, the disclosure of the Morrow agreement has changed the nature of this case.

In total, Levy neglected to mention four licensing agreements that L&L had with third parties.  Levy signed those agreements.  He knew the parties to the agreements personally, sometimes as close friends.  He was able to remember the Anglim Winds agreement with clarity during his first deposition yet specifically denied that Anglim had a Wings agreement.  Given the foregoing facts, the court does not believe Levy's assertions that he simply forgot the two more problematic agreements.  Therefore, the court finds that Levy intentionally withheld his knowledge of the Anglim Wings agreement and the Morrow agreement.  The court further imputes knowledge of the Yacobi and Rosenberg agreements to Levy.  Levy's intentional withholding, under oath, of the Morrow, Anglim Wings, and other agreements is L&L's intentional withholding of those agreements.

## C.     Rules 26 and 37

L&L's discovery violations go beyond Levy's willful nondisclosure of the Anglim Wings and Morrow agreements.  L&L violated Rules 26 and 37 by (1) failing to identify, request, and disclose the Yacobi agreement,[8] which was the subject of separate litigation in 2007, and (2) failing to find, identify, and disclose those documents L&L had in its possession from the

---

[8] Levy also claims that he failed to remember the Yacobi agreement even though he signed it half a decade after the Anglim Winds agreement, which he was able to remember.

17

beginning of discovery—a copy of the Morrow agreement and documents evidencing the Rosenberg agreement.

First, the Yacobi agreement was known to L&L as recently as 2008, when L&L voluntarily dismissed a case against Yacobi. 2008 Yacobi Litig. Report & Compl. [DE-176-4]. The Yacobi agreement, which was not disclosed to Beach Mart during discovery, is attached to the complaint in that case. *Id.* (Ex. B to the Complaint). As of 2008, L&L and its attorneys evidently had a copy of the Yacobi agreement. L&L does not explain its failure to identify and produce that document.

Second, as shown in Nancy Cibrano's affidavit, L&L had in its possession, at very least, a copy of the Morrow agreement and documents evidencing the Rosenberg agreement. In her affidavit, Cibrano states that she is responsible for "the retention and storage of L&L's corporate documents, and the oversight of all legal matters," among other things. Decl. Nancy Cibrano [DE-171-2] ¶ 5. She briefly outlines the multiple searches she conducted in response to Beach Mart's requests for production. For her first search, Cibrano searched the second floor of L&L's offices and the subbasement where L&L kept its old documents in boxes and file cabinets. *Id.* ¶ 9. Her second search encompassed "all of L&L's files pertaining to L&L Wings" in those same areas, but she also returned to the building from which L&L had moved and searched the basement there for any documents that had been inadvertently left. *Id.* ¶ 11. She found none. *Id.* After Beach Mart's motion for sanctions, Cibrano conducted a third search for the same documents. *Id.* at ¶ 12. She also searched for a log identifying what documents had been destroyed prior to the 2008 move, but could not find it. *Id.* ¶¶ 12-13. What she found instead was a handyman. *Id.* ¶ 13. She asked the handyman if he knew of anywhere else in the

18

subbasement that might have records. *Id.* The handyman happened to know of one possible

place and directed her to a box that contained files for Morrow and Rosenberg. *Id.* Despite

L&L's claims not to have known of that box, the documents contained therein were in L&L's

actual possession. At very least, L&L was negligent in failing to find and disclose those

documents.

Rule 37(c)(1) provides a self-executing sanction where "a party fails to provide

information or identify a witness as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1).

This failure to provide information under Rule 26 includes the failure to supplement the written

response to the Rule 34 request for production. *See id.* Furthermore, "sanctions may be imposed

even for negligent failures to provide discovery." *Fjelstad v. Am. Honda Motor Co., Inc.*, 762

F.2d 1334, 1343 (9th Cir. 1985). Where a party fails to properly supplement or correct its

responses to a Rule 34 request for production as required by Rule 26(e), that party faces the

automatic sanctions of Rule 37(c)(1) "unless the failure was substantially justified or is

harmless." Fed. R. Civ. P. 37(c)(1). "The determination of whether a Rule 26(a) or (e) violation

is justified or harmless is entrusted to the broad discretion of the district court." *Reed v.

Washington Area Metro. Transit Auth.*, No. 1:14CV65, 2014 WL 2967920, at \*2 (E.D. Va. July

1, 2014). The party facing sanctions bears the burden of establishing justifiability or

harmlessness. *Carr v. Deeds,* 453 F.3d 593, 602 (4th Cir. 2006), *abrogated on other grounds by

Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam).

District courts in this Circuit generally follow a five-factor test in determining whether

nondisclosure of evidence is harmless or substantially justified. *See S. States Rack & Fixture*,

318 F.3d at 596-97. Those factors are

(1) the surprise to the party against whom the evidence would be offered;
(2) the ability of that party to cure the surprise;
(3) the extent to which allowing the evidence would disrupt the trial;
(4) the importance of the evidence; and
(5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at 597. The first four factors relate primarily to harmlessness, while the latter relates primarily to justifiability. *Id.* The court need not consider all of the factors in reaching a conclusion on harmlessness and justifiability. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011). Indeed, the first two factors, surprise and the ability to cure the surprise, do little work in the present case. The initial surprise of L&L's nondisclosure has long worn off, and Beach Mart has largely been able to cure the surprise through its own efforts. However, Beach Mart should never have needed to work to discover these documents. Instead, L&L should have done its duty under the rules by initially identifying and disclosing the responsive licensing agreements. Because of this, the court will not evaluate the first two factors in considering whether L&L's actions were harmless or justified. The factors that then remain are (1) the degree to which trial was disrupted because of the evidence's discovery,[9] (2) the importance of the evidence, and (3) the non-disclosing party's explanation for its failure to disclose. The first two questions deal primarily with whether the violation was harmless, while the latter deals with justification.

### 1. Harmlessness

In evaluating whether L&L's violations were harmless, the court considers the degree to which the trial was disrupted because of the undisclosed evidence, as well as the importance of the evidence. The court will also consider L&L's arguments in favor of harmlessness.

---

[9] The court notes the slight rephrasing of this factor accounts for the fact that preclusion will not be sought (nor helpful) in the present case. Instead, because Beach Mart seeks the evidence's admission, the court must simply consider the disruption to the trial.

The discovery of the undisclosed agreements, particularly the Morrow agreement and its potential implications, did more than simply disrupt trial. Instead, this court had to reset the entire case in light of Beach Mart's amended complaint, which contained wholly different claims and defenses. Without looking to the merits of the amended complaint, the court can readily determine the impact of the undisclosed licensing agreements on this case, particularly the Morrow agreement. These same facts also underscore the importance of the evidence. Both the disruption of the trial and the importance of the evidence weigh against a finding that L&L's violations were harmless.

Beach Mart makes four arguments as to why its failure to disclose the licensing agreements was harmless:

(a) the Morrow Agreement does *not* provide any substantive support for Beach Mart's claims or defenses;
(b) the other [undisclosed agreements] do not provide any substantive support for Beach Mart's claims or defenses;
(c) Beach Mart could have discovered the Morrow Agreement on its own; and
(d) Beach Mart has cured any "surprise" that could be claimed as a result of its alleged untimely discovery of the [undisclosed agreements].

L&L's Mem. Opp'n Beach Mart's Mot. Sanctions [DE-171] at 21 (emphasis in original). All of these arguments fail.

First, L&L argues that the Morrow agreement and other undisclosed agreements do not provide substantive support for Beach Mart's claims or defenses. These arguments are legal conclusions, the merits of which have yet to be determined, and the court will not look to the ultimate outcome of this dispute to determine harm.[10] Such a determination is not necessary. As

---

[10] The court does note that these issues are hardly settled. For example, L&L argues, unsurprisingly, that the Morrow agreement terminated years before Beach Mart's 2005 agreement with L&L, *see* L&L's Mem. Opp'n Beach Mart's Mot. Sanctions [DE-171] at 23, but Morrow disputes that assertion, *see* Morrow Dep. [DE-166-13] at 65:8-12 ("I'm a little surprised

discussed above, the undisclosed agreements have opened the door to colorable claims and defenses regardless of their ultimate impact. In turn, Beach Mart's new claims and defenses have required a restart of this case. Harm can be measured not only in the ultimate outcome of a case, but also in the effects on case proceedings. Here, the latter harm is manifest.

Second, L&L argues that Beach Mart could have discovered the Morrow agreement on its own. This court has already largely disposed of this argument in its order granting Beach Mart leave to file an amended complaint. *See* December 16, 2013 Order [DE-183] at 4-5 ("'[R]easonable diligence' cannot mean Beach Mart was expected to contact each of these [Wings trademark] registrants and inquire whether L&L negotiated a licensing agreement with them to use the Wings mark."). More importantly, the rule is not that a requesting party in a case must go out and find responsive documents. Rather, the rule is that even where a requesting party already has documents in its possession, or could otherwise access those documents, the disclosing party may not withhold those documents. *See, e.g.*, *Westchester Surplus Lines Ins. Co. v. Clancy & Theys Constr. Co.*, No. 5:12-CV-636-BO, 2013 WL 6058203, at *7 (E.D.N.C. Nov. 15, 2013). Even if Beach Mart could have discovered the Morrow agreement on its own, it did not have a duty to do so. Moreover, Beach Mart's initial requests for production covered the Morrow agreement. *See* Beach Mart's First Reqs. Produc. [DE-160-3] at 13; Beach Mart's Second Reqs. Produc. [DE-160-2] at 2. L&L had the duty to respond and produce. Thus, L&L's various assertions about Beach Mart's responsibilities to independently discover the undisclosed agreements improperly attempt to shift the burden of discovery onto the requesting party. L&L's arguments are inappropriate and against the spirit and purpose of the discovery rules.

---

to see that [L&L] tried to register the mark [in 2006] when, as far as I was concerned, we still had a valid licensing agreement with them.").

Third, L&L argues that Beach Mart has now cured any surprise it might be able to claim regarding the undisclosed licenses.  The court already addressed this argument above:  while Beach Mart has since cured the surprise, it should not have needed to do so in the first instance.  Furthermore, curing the surprise alone would not make L&L's discovery violations harmless.  The discovery of the licensing agreements precipitated a complete restart of this case with an amended complaint containing new claims and defenses, a new round of discovery, and a new trial date.  The harm has already occurred.

Given the foregoing, the court finds no merit in L&L's arguments that its discovery violations were harmless.

### 2.  Substantial Justification

In considering whether a failure to produce responsive agreements is substantially justified, the court looks to the non-disclosing party's explanation for the failure.  *S. States Rack & Fixture*, 318 F.3d at 597.  L&L offers various explanations attempting to justify its actions:

(a)  L&L did not have control over Morrow or Anglim so as to be able to require them to turn over the licensing agreements;
(b)  L&L conducted good faith searches for all licensing agreements in its possession;
(c)  Rule 26(a) only required disclosure of documents L&L intended to use to support its claims and defenses, and L&L did not intend to use the undisclosed agreements;
(d)  Beach Mart never moved to compel over L&L's objections;
(e)  Levy merely forgot about the existence of the undisclosed agreements; and
(f)  L&L properly objected to the Rule 30(b)(6) deposition notice and to Beach Mart's requests for production.

For the reasons more fully discussed below, these arguments, taken as a whole, do not establish that L&L's discovery violations were substantially justified.

The court has already addressed the latter two explanations and does not find that they justify L&L's failure to disclose the licensing agreements.[11]  Furthermore, the court notes that L&L's legal arguments (Rule 26's requirements; Beach Mart's failure to move to compel; and L&L's objections) in many ways amount to the gamesmanship discouraged by the rules.  L&L uses these arguments to excuse its violations, but the Rules do not permit such abuse.

### i.  L&L's Control of Third Parties

L&L rightly argues that it had no control over Morrow, Anglim, or the other licensees sufficient to require L&L to request and turn over documents in their possession.  However, a party has control of documents where a party's attorney or former attorney has control, custody, or possession of those documents.  *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 501 (D. Md. 2000).  Beach Mart notes that, in 2007, L&L filed a lawsuit against Yacobi, one of the undisclosed licensees.  *See* 2008 Yacobi Litig. Report & Compl. [DE-176-4].  Attached to the complaint in that case is the Yacobi licensing agreement, which was not disclosed to Beach Mart during discovery.  *Id.* (Ex. B to the Complaint).  The lawsuit ended in 2008.  *Id.* at 1.  Thus, as of 2008, L&L and its attorneys evidently had a copy of the licensing agreement.  Where L&L's attorneys had possession and knowledge of the Yacobi agreement, L&L likewise had possession and knowledge of the Yacobi agreement.

The record shows no evidence that L&L attempted to contact its attorneys in the Yacobi case concerning the Yacobi agreement.  Thus, as to the Yacobi agreement, L&L's argument that

---

[11]  The court addressed Levy's testimony in Section B.2 of the Discussion.  In sum, the court does not find Levy's contentions that he simply forgot about the undisclosed agreements to be credible.  The court addressed L&L's objections to Beach Mart's discovery efforts in Section B.1 of the Discussion.

it had no control over third parties with responsive documents fails. L&L should have identified, requested, and produced the Yacobi agreement.

### ii. L&L's Searches for Licensing Agreements in Its Possession

The primary evidence of L&L's good faith searches is contained in Cibrano's affidavit. Decl. Nancy Cibrano [DE-171-2]. The court has already discussed Cibrano's searches at length. In sum, Cibrano affirms that she failed to find responsive documents in her first two searches, but that during her third search a handyman was able to show her a box containing the Morrow agreement and documents evidencing the Rosenberg agreement.

More important is what Cibrano does not do. She does not state that she spoke to L&L's attorneys, who would have been likely custodians of legal documents such as trademark license agreements. Indeed, Cibrano, as the person charged with "oversight of all legal matters" for L&L, should have been aware of the Yacobi lawsuit, which ended shortly before L&L moved its offices.[12] But Cibrano did not speak with the lawyers involved in the Yacobi lawsuit. Glaringly, the only person she says she spoke to was a building handyman during her *third* search for documents. He was able to direct her right to a box containing at least several of the undisclosed agreements.

Furthermore, Cibrano was responsible for the "retention and storage of L&L's corporate documents." *Id.* ¶ 5. The loss of a box of licensing agreements fell under her stewardship. Even if Cibrano did not know about the box of licenses in L&L's possession, she was part of L&L's negligence in failing to properly store the documents so as to be able to find them.

---

[12] This timing should also have saved the litigation documents from L&L's pre-move purge.

The court need not find that Cibrano's actions were willful or in bad faith to impose sanctions. "[S]anctions may be imposed even for negligent failures to provide discovery." *Fjelstad*, 762 F.2d at 1343. L&L's argument of good faith searches does not justify its discovery violations.

### iii. **L&L Did Not Intend to Use the Undisclosed Agreements**

The court agrees with L&L that Rule 26(a) does not require disclosure of documents or witnesses that a party does not intend to use to support its claims or defenses. However, L&L's argument ignores the rest of Rule 26, specifically subdivision (e), which imposes a separate duty. Under that subdivision, L&L had a duty to timely supplement or correct its responses to Beach Mart's requests for production. Rule 26(e) does provide an exception where "the additional or corrective information has [] otherwise been made known to the other parties during the discovery process." L&L argues that, because Beach Mart has already discovered all of the undisclosed agreements, the exception to Rule 26 relieved L&L of its duty to supplement its responses and produce the responsive documents. This argument succeeds only if L&L had no knowledge or possession of the undisclosed agreements prior to Beach Mart's discovery of the documents. But L&L did have both knowledge and possession. As discussed above, L&L had actual possession of a box of documents containing files for Morrow and Rosenberg. L&L's attorneys also had or knew of a copy of the Yacobi agreement. The court has also found that Levy knew of the undisclosed agreements. Because L&L had knowledge and possession of the undisclosed agreements, it had a duty to initially disclose or later supplement its discovery responses. It failed to fulfill that duty.

26

#### iv. Beach Mart's Failure to Move to Compel

L&L asserts that the court should not impose sanctions because Beach Mart never moved to compel. This argument fails. "[S]anctions for a violation of Rule 26(e) may be imposed under the court's inherent power even though no order compelling the discovery was violated." *Buffington*, 913 F.2d at 135. Furthermore, where a party seeking a Rule 30(b)(6) deposition does not seek to compel discovery over an opposing party's initial objection, the failure to compel "does not, in itself, make that category an impermissible subject of a 30(b)(6) deposition or an impermissible request for production of documents at a later time." *Gamby v. First Nat'l Bank of Omaha*, No. 06-11020, 2009 WL 963116, at *2 (E.D. Mich. Apr. 8, 2009).

The court further notes that L&L's position on compelling discovery would place parties such as Beach Mart in an extremely difficult procedural position. On two occasions, L&L asserted that it had produced all responsive documents.[13] L&L suggests that Beach Mart should

---

[13] L&L's attorneys stated on two occasions that L&L had produced all responsive agreements. One statement was made at Levy's first deposition during a discussion of whether the Benjamin agreement (one of the agreements originally disclosed by Levy) had been turned over. *See* First Levy Dep. [DE-166-10] at 286:17-289:12. L&L's attorney, Bennett Krasner, stated that "[L&L] endeavored to give [Beach Mart] all of the documents as you see by the sheer number of documents." *Id.* at 288:18-20. While L&L contends that this statement referred only to the Benjamin agreement, the court has difficulty imagining that the Benjamin agreement alone contained sufficient pages so as to be described as a "sheer number of documents." Instead, the court interprets "all of the documents" as referring to L&L's production generally.

Another statement, clearer than Krasner's, is found in a letter from L&L's counsel to Beach Mart's counsel on July 31, 2012. *See* Letter from J. Schouten [DE-166-12]. In that letter, L&L's attorney, Joseph Schouten, states that "L&L has produced the documents in its possession, custody, or control responsive to [Beach Mart's Second Set of Requests for Production, Request Number 1]." *Id.* at 1. Request Number 1 asked for "[a]ll agreements granting any person or entity permission, license or consent to use any name or trademark containing the word WINGS as a component thereof." Beach Mart's Second Set Reqs. Produc. [DE-160-2] at 2. The language in Request Number 1 would cover all of the undisclosed agreements. L&L contends the letter applies only to the request for the Benjamin agreement, but the plain language of the letter indicates otherwise. Moreover, in the next paragraph, Mr. Schouten states that L&L will not reconsider and revise its responses to the Second Request for

27

not have believed its assertions of complete production and instead should have moved to compel. But to what extent does L&L propose that Beach Mart should have moved to compel? Should Beach Mart have moved to compel on each of L&L's objections? And on what grounds does L&L propose that Beach Mart should have moved to compel? L&L's contentions would place Beach Mart in an indefensible position. Under L&L's scenario, Beach Mart would either have to (1) risk losing access to documents that may or may not exist (and according to L&L's original assertions, did not exist) by not moving to compel, or (2) risk sanctions by using discovery tactics that could readily be interpreted as harassment and oppressiveness. L&L's argument that Beach Mart should have moved to compel is untenable.

In sum, L&L's substantial justification arguments fail. Many of these arguments amount to the "artificially restrictive or hypertechnical" arguments and objections discouraged by the rules governing discovery. The remaining factual justifications involve Levy's testimony, Cibrano's searches, and Yacobi's lawsuit. This court has found that Levy's testimony was not credible and that he willfully withheld disclosure of the Morrow agreement and the Anglim Wings agreement. Cibrano's searches, according to her affidavit, were not conducted in bad faith nor in willful disregard of the undisclosed agreements, but L&L's failure to properly store or find the undisclosed agreements amounted to negligence on its part. The lawsuit involving Yacobi indicates that L&L's attorneys and Cibrano were, or should have been, aware of the Yacobi agreement. L&L never disclosed that agreement to Beach Mart. L&L has failed to justify its conduct, and, accordingly, merits sanctions.

---

Production because those responses "are complete and appropriate." Letter from J. Schouten [DE-166-12] at 1-2. Those statements were shown to be false with the discovery of the box of undisclosed agreements and with the discovery of the Yacobi litigation.

**D.     Appropriate Sanctions**

The court turns now to the type and amount of sanctions that will (1) appropriately remedy the harm caused by L&L's discovery violations, and (2) sufficiently deter future parties from committing similar violations.  Where a party seeks alternative sanctions under Rule 37 (as opposed to preclusion), courts may consider the following factors:

> (1) whether the non-complying party acted in bad faith,
> (2) the amount of prejudice that noncompliance caused the adversary,
> (3) the need for deterrence of the particular sort of non-compliance, and
> (4) whether less drastic sanctions would have been effective.

*Law Enforcement Alliance of Am., Inc. v. USA Direct, Inc.*, 61 F. App'x 822, 830 (4th Cir. 2003). Courts typically use these factors in determining the *type* of alternative sanction.  *Id.*  A district court need not find that all four factors were present to grant alternative sanctions.  *See id.* at 830-31.  Instead, the court may consider the presence and magnitude of the factors in determining the magnitude of the sanctions.  *See id.* at 831.  Indeed, Rule 37(c)(1) does not require that a party act willfully or in bad faith for sanctions to apply.  *See S. States Rack & Fixture*, 318 F.3d at 596.  "[S]anctions may be imposed even for negligent failures to provide discovery."  *Fjelstad.*, 762 F.2d at 1343; *see also American Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 109 F.R.D. 263, 266 (E.D.N.C. 1985) ("Negligent failure to allow reasonable discovery, if not substantially justified, may warrant sanctions.").  The level of a party's culpability may, however, influence which sanctions the court will impose.

**1.     L&L's Bad Faith**

The court finds that L&L acted in bad faith.  This bad faith was manifested in Levy's false testimony during his first Rule 30(b)(6) deposition when he failed to mention any of the undisclosed agreements and specifically asserted that Anglim never had a Wings agreement.

29

Levy had every reason to remember the Anglim Wings agreement: he had signed it just two years before the Anglim Winds agreement, it ran until the signing of the Winds agreement, and the specific mention of it should have been just as capable of refreshing Levy's memory as the discovery of the undisclosed agreements. Levy's failure to disclose the Anglim Wings agreement or the Morrow agreement was in bad faith.

Furthermore, while not rising to a level of bad faith, L&L's failure to disclose the Yacobi agreement or to disclose the documents in the subbasement box amounted to negligence. Negligence alone would be sufficient to impose monetary sanctions on L&L for its discovery violations.

### i. The Parties' Gamesmanship Generally; L&L's Gamesmanship Specifically

Further compounding these facts is the general gamesmanship displayed by the parties, particularly L&L as it pertains to these discovery violations. The court grows weary of this gamesmanship. Both of the parties and their attorneys have engaged in litigation behavior that is inappropriate, particularly for the attorneys who are also officers of the court. For example, during the court's stay on motions practice to allow the parties to focus on settlement, both parties engaged in activities that would shore up their litigation positions once the court reopened motions practice. The court can only conclude from that activity that neither party was seriously interested in settlement negotiations, despite representations to the contrary at the December 12, 2013 hearing. While those actions are not subject to sanctions, L&L's present discovery violations are.

L&L's gamesmanship during the course of proceedings resulting in this order is unacceptable. Instead of using discovery to "expose the facts and illuminate the issues," L&L

30

seeks use the rules to shield its violations. This is seen, for example, in L&L's arguments nitpicking over whether an agreement was "received" or "given." *See* L&L's Mem. Opp'n Beach Mart's Mot. Sanctions [DE-171] at 5 n.3. L&L also attempts to downplay the importance of the Morrow agreement by arguing that that agreement would do nothing to help Beach Mart's naked licensing defense. L&L's Mem. Opp'n Beach Mart's Mot. Sanctions [DE-171] at 12. Indeed, the court notes that L&L's objections to Beach Mart's requests for production and Rule 30(b)(6) deposition notice appear to presuppose the Morrow agreement. Beach Mart's discovery requests covered all agreements concerning the Wings trademark, regardless of whether they were given or received. L&L cannot rely on its objections to withhold a document of manifest relevance: the Morrow agreement provides Beach Mart with a basis for new claims and defenses, claims and defenses that Beach Mart is within its rights to bring. L&L had a duty to disclose the Morrow agreement.

The court repeats the standards outlined at the beginning of this order: "The rules of discovery were not designed to encourage procedural gamesmanship, with lawyers seizing upon mistakes made by their counterparts in order to gain some advantage. *See Outley*, 837 F.2d at 590; *Mainstreet Collection*, 270 F.R.D. at 240. Instead, "[p]arties must respond truthfully, fully, and completely to discovery or explain truthfully, fully, and completely why they cannot respond." *Mainstreet Collection*, 270 F.R.D. at 240. Rule 26(g) imposes an "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of [the] Rules," which are meant to "expose the facts and illuminate the issues." Fed. R. Civ. P. 26, Advisory Committee's Notes (1983 Amendment). L&L failed to live up to its discovery obligations in this case to a degree that merits sanctions under the Rules.

To forestall future gamesmanship, the lawyers for each party are hereby warned that the court will not tolerate further instances of the gamesmanship that has been occurring throughout this litigation. The court reminds the lawyers that this court has inherent authority to sanction them individually, as officers of the court, in the event of misconduct. *See White v. Raymark Indus., Inc.*, 783 F.2d 1175, 1177-78 (4th Cir. 1986).

### 2. The Amount of Prejudice Caused by L&L's Violations

Returning to the analysis of appropriate sanctions, Beach Mart experienced substantial prejudice due to L&L's violations. The prejudice caused by L&L's violations can be measured in the additional cost and delay of trial. This court has had to reset this case because of the impact of the undisclosed agreements. This is an inconvenience not only to the parties, but also to the court, and the court is mindful and protective of its limited resources.

### 3. The Need to Deter Similar Violations

The court recognizes a need to deter both willful nondisclosure and gamesmanship. The court has already discussed both of these issues and only adds that sanctions must be sufficient not only to remedy the harm caused, but to provide a sufficient deterrent such that present and future parties will be forewarned from acting similarly. The equitable sanction imposed below provides that additional deterrent.

### 4. Whether Less Drastic Sanctions Would Be Effective

Less drastic sanctions than those imposed below would not suffice. An award of monetary sanctions to cover the costs expended in dealing with L&L's violations would simply place the parties close to where they stood had the violation not occurred. Such an award would not account for the time lost in the case or the cost to the court, nor would it provide a deterrent

effect. An additional sanction is necessary. The preclusion sanction below appropriately complements the monetary sanction.

**E.     Sanctions Imposed**

The court has considered the record and now finds that two of the sanctions requested by Beach Mart are appropriate. First, Beach Mart is awarded costs and attorney's fees incurred in connection with its efforts to discover the undisclosed agreements. This sanction is appropriate to remedy a substantial portion of the harm caused by L&L's discovery violations.

Second, with respect to Beach Mart's use of the Wings and Super Wings trademarks, L&L is precluded from (a) asserting trademark infringement and unfair competition claims against Beach Mart, and (b) seeking any form of equitable relief from Beach Mart (including, but not limited to, injunctive relief, disgorgement of profits, or any other equitable defense). The court limits this sanction to those stores already operated by Beach Mart. That is, if Beach Mart were to begin using the Wings or Super Wings trademarks outside of Beach Mart's current geographic reach, L&L would not be precluded from then bringing meritorious trademark infringement and unfair competition claims against or seeking equitable relief from Beach Mart. The court finds the preclusion sanction to be equitable—Beach Mart is allowed to continue using the Wings and Super Wings trademarks where it has been operating its stores for many years, while L&L's interests in the Wings trademark is still protected outside of that zone. Furthermore, this sanction provides an added deterrent to those who would consider committing similar violations.

## CONCLUSION

For the foregoing reasons, Beach Mart's Motion for Sanctions [DE-165] is ALLOWED.

Beach Mart shall file an affidavit, within 14 days of this order, setting out the expenses it

incurred (1) in filing its Motion for Sanctions [DE-165], and (2) in its additional efforts to

discover the undisclosed agreements.[14] Any such affidavit, or additional filing if necessary, shall

demonstrate

(1) why such a fee is reasonable for the time and labor expended;
(2) the customary fee for similar work; and
(3) the experience and ability of the attorney or attorneys rendering such services.

L&L may file a response, if any, within seven days of service of the affidavits. The court will

then issue an order setting the amount due.

Additionally, L&L is precluded from (a) asserting trademark infringement and unfair

competition claims against Beach Mart, and (b) seeking any form of equitable relief from Beach

Mart (including, but not limited to, injunctive relief, disgorgement of profits, or any other

equitable defense). This sanction is limited to those stores already operated by Beach Mart.

Therefore, L&L's trademark infringement claims (Third and Fourth Counterclaims) of its

Answer and Counterclaim [DE-18] are hereby DISMISSED.

SO ORDERED.

This the **3** day of October, 2014.

James C. Fox

JAMES C. FOX
Senior United States District Judge

---

[14] The Morrow, Rosenberg, Yacobi, and Anglim Wings agreements.

34