UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION


BEACH MART, INC.,              )
                              )
            Plaintiff,         )
      V.                       )    2:11-CV-44-BO
                              )
                              )
L&L WINGS, INC., et al.,       )
                              )
            Defendants.        )
_____  )



STATUS HEARING
JULY 26, 2017
BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Beach Mart, Inc.:

Charles A. Burke
Womble Bond Dickinson
555 Fayetteville Street, Suite 1100
Post Office Box 831
Raleigh, NC 27602

Stephen F. Shaw
Womble Bond Dickinson
300 N. Greene St., Suite 1900
Greensboro, NC 27401

David G. Harris, II
Goldberg Segalla
800 Green Valley Road
Suite 302
Greensboro, NC 27408

OFFICIAL COURT REPORTER:  Michelle Maar, RDR, RMR, FCRR
Stenotype with computer-aided transcription

1    <u>For L&L Wings, Inc.:</u>

2    Richard S. Taffet
     Timothy J. Stephens
3    Morgan, Lewis & Bockius
     101 Park Avenue
4    New York, NY 10178-0060

5    A. Charles Ellis
     Ward & Smith
6    Post Office Box 33009
     Raleigh, NC 27636-3009

7

8    <u>For Pennsylvania National Mutual Casualty Insurance Co.:</u>

9    Shelley Walters Coleman
     Hedrick, Gardner, Kincheloe & Garofalo
10   6000 Fairview Road, Suite 1000
     Post Office Box 30397
11   Charlotte, NC 28230

12

     <u>For Shepard R. Morrow:</u>
13
     Franklin M. Averitt, III
14   Marshall, Williams & Gorham
     14 South Fifth Avenue
15   Wilmington, NC 28401

16

17

18

19

20

21

22

23

24

25

1          <u>WEDNESDAY, JULY 26, 2017, 2:00 P.M.</u>

2          THE COURT:  Good afternoon.

3      I've inherited this case.  And I'll listen to you about

4  where it is.  And I would like to bring it to a conclusion

5  in some way.  It's been here a long time.

6      You're the plaintiff?

7          MR. BURKE:  Yes, Your Honor.  Charles Burke for

8  Beach Mart.

9          THE COURT:  Okay.

10          MR. BURKE:  Your Honor, as the Court is aware,

11  the case is approximately six years old at this point.

12      We've had two complete sets of summary judgment

13  rulings -- neither of which have resulted in the resolution

14  of any claims.  Judge Fox found that there were factual

15  issues.

16      Judge Fox had divided --

17          THE COURT:  Is all that up for grabs?  Am I bound

18  by anything he did?

19          MR. BURKE:  Well, Your Honor, I don't know.  I

20  guess I think it's the law of the case.  If he ruled that

21  there are fact issues on summary judgment, that it's the

22  law of the case.

23      Although, admittedly, he didn't go through the entire

24  motion and identify every issue that he thought was a fact

25  issue.  So I think that gets kind of complicated.

1        My main point, though, is that he had those motions

2   for about 18 months and, at the end, denied them all,

3   finding them either moot or finding that there were factual

4   issues that precluded summary judgment.

5        And, at this point, we're looking at a trial in this

6   case.  Given the additional discovery that needs to be

7   completed, the earliest that the trial would happen in this

8   case is going to be seven years from filing.

9        And if we have additional summary judgment motions,

10  you know, we're looking at eight, nine years, something

11  like that -- when we've already had two complete sets of

12  summary judgment rulings, fully briefed and considered and

13  ruled upon by the Court.

14       We would suggest to the Court that there's no reason

15  for the delay that would be necessary to do a third motion.

16            THE COURT:  Just out of curiosity, have any of

17  you lawyers -- I guess there are six or eight lawyers --

18  any of you appeared with me before in court?

19            MR. BURKE:  Your Honor, I believe I have.  But it

20  was probably many years ago.  And I'm not certain exactly

21  when --

22            THE COURT:  Really?  What kind of a case?

23            MR. BURKE:  I don't remember.  I --

24            THE COURT:  It wasn't a very memorable

25  experience?

1              MR. BURKE:  Well, Your Honor, I only do

2      intellectual property.  And I remember having a case that

3      had to do with, Centex was the client, it had to do with

4      house plans and some copyright claim.  I'm not positive

5      that was Your Honor but --

6              THE COURT:  Yes.  It was me.

7              MR. BURKE:  -- I think it was.

8              THE COURT:  It was me.

9              MR. BURKE:  And that was probably 10 or 15 years

10     ago.

11             THE COURT:  Yes.  That's right.

12         Mr. Ellis, you've been in court?

13             MR. ELLIS:  Yes, Your Honor.  Good afternoon.

14     It's good to see you again.  It's been a long time since

15     we've had anything, I've had anything.  My law partners

16     have.  In fact, just recently --

17             THE COURT:  I guess there's a breakdown now since

18     you're back here.  The goal was never to be back in front

19     of me.

20             MR. ELLIS:  It's a good experience for Mr. Evans,

21     in fact, Judge.

22             THE COURT:  I should have a big detour sign out

23     in front of there -- do not enter.

24             MR. BURKE:  So, Your Honor, Judge Fox had divided

25     the case into --

1          THE COURT:  We're different.

2          MR. BURKE:  I understand.  For procedural

3    purposes -- and you need to know, in order to understand

4    where the case is procedurally, he had divided it into two

5    phases.  Basically this is a fight over who owns a

6    trademark.

7          THE COURT:  I would never do anything like that.

8    I mean, it's a sea change, to be candid.  I mean, my goal

9    is to rush you as quickly as possible to the appellate

10   court so they can figure it out.

11         MR. BURKE:  Well, Your Honor, I agree that, in

12   practice, having those two phases has not turned out to be

13   a very efficient process.  I agree with that.

14         THE COURT:  I will find some way to terminate the

15   case.  I don't know how, but I will find a way.  And then

16   they can say you're wrong or you're right.  And that's the

17   life cycle of something like this.

18         MR. BURKE:  Well, Your Honor, at this point, we

19   have additional discovery issues to be completed.

20      Basically, when Judge Fox put the case in two phases,

21   we were only allowed to do discovery on the first phase.

22   The second phase remains.

23         THE COURT:  How do the clients -- you know,

24   obviously you're not going to answer these questions -- how

25   do the clients have the resilience to pay for a battery of

1   lawyers over this long period of time?  Usually the
2   government is the only one that can do that.
3           MR. BURKE:  Your Honor, my client is extremely
4   frustrated with the process.  I'm not sure how much detail
5   the Court has looked --
6           THE COURT:  None of the lawyers are volunteers,
7   right?
8           MR. BURKE:  No, Your Honor.  We're not.
9           THE COURT:  Everyone is making a quarterly
10  account of what they do probably.
11          MR. BURKE:  Basically what happened here, Your
12  Honor, is this started out as one case.  There was some
13  evidence that was withheld.  We found that evidence at the
14  end of the case.  We made an amended complaint.
15      Judge Fox issued a rather severe sanction order for
16  the withholding of that evidence.  But then we had totally
17  new claims that we asserted based on that evidence.
18      He also awarded fees -- which has not been ruled upon
19  yet.  And so that evidence is pending.  It ranged between
20  70 and 150,000 I think.  The parties differ on what fees
21  should be awarded.
22      But that's one of the reasons that the case has taken
23  so long is because we found that evidence roughly two years
24  into the case and had an amended --
25          THE COURT:  Does no one have any money in the

1    case?  Is no one interested in accepting some money or

2    giving up some money and going home?  I mean, is it that

3    good of a thing?

4              MR. BURKE:  Well, Your Honor, all I can tell you

5    is that we've made several very involved efforts at

6    settling the case.

7              THE COURT:  Demands.

8              MR. BURKE:  I'm sorry?

9              THE COURT:  Demands.  You're the plaintiff.

10   Plaintiffs make demands.

11             MR. BURKE:  Yes.  Your Honor --

12             THE COURT:  Defendants make offers.

13             MR. BURKE:  We made our demands clear at the

14   settlement conference that Magistrate Judge Gates oversaw.

15   We were here, I think, for at least two days in a

16   settlement process with him.  We made our demands.

17             THE COURT:  It's about money, isn't it?

18             MR. BURKE:  It certainly includes money.

19             THE COURT:  Civil lawsuits should be about money.

20             MR. BURKE:  It is, yes.  But there's also --

21             THE COURT:  And maybe the protection of a

22   protectable right.

23             MR. BURKE:  Yes.  The trademark is at issue.  And

24   obviously ultimately that comes down --

25             THE COURT:  And it's Wings, right?  That's the

```
 1   trademark?

 2            MR. BURKE:  Yes.

 3            THE COURT:  This is -- I won't use any

 4   descriptive terms -- but this is, these are the stores that

 5   sell things that no one ever needed at the beach.  They

 6   sell them to Yankees who've come down here and spent way

 7   too much money on a cottage and then it rains and they go

 8   to Wings.

 9            MR. BURKE:  Yes, Your Honor.  And you're thinking

10   of the Wings stores -- the defendant runs the stores in

11   Myrtle Beach or at least used to be a bunch of stores in

12   Myrtle Beach.

13       My client runs the stores in the Outer Banks.  My

14   client --

15            THE COURT:  And they're spaced every 5 miles

16   basically?

17            MR. BURKE:  There's a lot of them.  I'm not sure

18   of the current number.  They're actually closing some of

19   them in Myrtle Beach.  But they're opening -- I mean, the

20   Outer Banks has a lot.  Myrtle Beach, they're moving south

21   I think, down to Florida.

22            THE COURT:  Do you have hurricane insurance?  Or

23   would that wipe out all the Wings?

24            MR. BURKE:  I don't know, Your Honor.  I would

25   have to ask my client.
```

1          THE COURT:  Okay.

2          MR. BURKE:  I'll let you speak --

3          MR. TAFFET:  Good morning, Your Honor.  Richard

4    Taffet.  I'm with the Morgan Lewis firm.

5          THE COURT:  Where are you from?

6          MR. TAFFET:  I was born in New York City.

7          THE COURT:  Where is your law practice?

8          MR. TAFFET:  In New York.

9          THE COURT:  In New York?

10         MR. TAFFET:  Yes.

11         THE COURT:  Okay.  Welcome down here.

12         MR. TAFFET:  Thank you very much.  Mr. Ellis and

13   everybody else who inquired about it said it would be an

14   interesting experience here before Your Honor.

15         THE COURT:  I'm not trying to be difficult.  I'm

16   invested in closure.  The law exists for only one

17   purpose -- that's finality.

18         MR. TAFFET:  Absolutely.

19         THE COURT:  If you can get along and decide

20   things without being in the law, then that's a perfect

21   world.  And what we make you do is things you don't want to

22   do.

23         MR. TAFFET:  So where we are in the case, to

24   answer your question specifically, is we have submitted our

25   joint report.  It went to Judge Fox.  And I'm assuming it's

1    come over to you at this point.  And the parties are pretty

2    much aligned on a proposed schedule -- of course, subject

3    to the Court's order and accepting of it.

4        And there is a complexity in this case.  There is one

5    case where Beach Mart is the plaintiff and L&L Wings is the

6    defendant.  There's another case where L&L Wings is the

7    plaintiff and Beach Mart is the defendant.  And then we have

8    counterclaims that are pending.

9              THE COURT:  They have what?

10             MR. TAFFET:  Counterclaims.  So we have answered

11   the complaint that Beach Mart, it's their amended

12   complaint.

13             THE COURT:  So why don't I just grant judgment

14   for each side against the other and --

15             MR. TAFFET:  And dismiss the case?

16             THE COURT:  Yes.  And let you go to the Court of

17   Appeals.  I mean, you really need to get to the Court of

18   Appeals because nothing I do here is of any value.

19             MR. TAFFET:  Right.  So what I was going to

20   submit is that in the scheduling order that we proposed to

21   the Court, each side has agreed that we should have five

22   months of fact discovery, there's a few more depositions to

23   take place, and have 30 days for experts after that.

24       The only or the single issue that we have not agreed

25   upon is this question of once all that's done and finished,

1   whether either party can make a summary judgment motion.

2           THE COURT:  Of course you can.

3           MR. TAFFET:  Well, that's what I was going to

4   say.

5           THE COURT:  When is a trial ever preferred to a

6   summary judgment?  Never.

7           MR. TAFFET:  I'm not sure to be quite honest,

8   Your Honor.

9           THE COURT:  Maybe against you.  But,

10  nevertheless, summary judgment has finality and speed.

11  Trials have uncertainty and delay.

12          MR. TAFFET:  And, indeed, as we've discussed with

13  counsel for Beach Mart, there are issues that we believe

14  that have already been addressed in discovery.

15      The pending motions that counsel has referred to, the

16  two that were brought by L&L Wings were dismissed by Judge

17  Fox as moot because he had dismissed certain of our claims,

18  two claims, concerning the ownership of the trademark,

19  without prejudice though, pending our reassertion of those

20  claims as counterclaims.  So we've reasserted.  So he never

21  reached the merits of those in any event.

22      And then there are issues on the affirmative claims

23  that Beach Mart has asserted against L&L Wings which we

24  think would be subject to proper summary judgment motions

25  also.

1       But that would be after -- we think discovery should be

2   very limited in this case.  We've agreed to the five months

3   period.  We think there's just a handful of depositions,

4   perhaps, each side is allowed eight under the joint

5   proposal, non-duplicative of prior.  So we're ready to

6   proceed and get this case to the finish line.

7       The only other thing --

8               THE COURT:  What's the case worth?  I mean, 100

9   grand?  200 grand?

10              MR. TAFFET:  It's not even about money.  It's

11  about --

12              THE COURT:  But it's got to be about money.

13              MR. TAFFET:  Not necessarily, Your Honor.  And

14  I'll explain.  It really is about who can use and who can

15  open stores under the Wings name.

16      And right now -- I mean, we did have a settlement

17  conference with Magistrate Gates.

18              THE COURT:  Wings is not like Coca Cola.  I mean,

19  this is a weak mark.  It's not like N-Y on the Yankees cap.

20  It doesn't go all over the world.  You call it Butterfly

21  Wings or Wings and Things, you know.

22              MR. TAFFET:  That's exactly the point.  And

23  without diving into the weeds right now, it's really, there

24  are, the issue is where is it strong -- which is in these

25  beach communities, for example.  And that's --

1          THE COURT:  Does anybody have a claim that

2    there's no defensible mark at all?  That it's -- is it a

3    registered mark or is it a trade dress?

4          MR. TAFFET:  No, no, no.  It's a registered

5    trademark.  I mean, the issue is L&L Wings has been using

6    the Wings mark since 1978.  It was a predecessor company,

7    same owners, who used it from 1974 for retail stores.

8          There was a use of the mark for clothing by a company

9    named Piedmont.  Piedmont was owned, the company, it was a

10   clothing company, an apparel company that was owned by Mr.

11   Morrow, who is a party to this case.  His father ran that

12   company.  They stopped using the mark.  They started using

13   the mark.  But they never used it for retail sales.

14         There was an agreement between L&L and Mr. Morrow back

15   in the '90s after Piedmont went bankrupt.  Those are issues

16   all involved in the case.  And to decide whether Morrow

17   ever had any rights, whether his rights related to the

18   retail use --

19         THE COURT:  What happens if there's no mark?

20         MR. TAFFET:  Well, I think --

21         THE COURT:  The cases all collapse, don't they?

22         MR. TAFFET:  Well, but I think, with respect, I

23   think there is clearly value to the mark.

24         THE COURT:  I know you think so.  But suppose I

25   think it's not a defensible mark at all?

1          MR. TAFFET:  Well, then you're going to dismiss

2     the case.  And we'll go up to the Fourth Circuit and --

3          THE COURT:  And they'll say well, this is like

4     butterfly or this is like backyard or this is like, you

5     know, this is like north.  And, I mean, there's nothing

6     distinctive or protectable about the name Wings or the

7     icon.  And there you go.

8          MR. TAFFET:  And that may be the resolution, you

9     know.  The proof we would argue is --

10         THE COURT:  It's like the Seinfeld program --

11    it's about nothing.

12         MR. TAFFET:  Well, as you say, we've been doing

13    this for a few years.  I hope our clients -- our clients

14    certainly don't see --

15         THE COURT:  They what?

16         MR. TAFFET:  Our clients certainly don't see this

17    case as about nothing obviously.

18         THE COURT:  Well, no, they're invested.  They've

19    capitalized this lawsuit to the 6 or 7 figure extent.  I

20    don't know why, but they've capitalized it.  They've

21    decided that they're going to invest in the activity or

22    enterprise of a lawsuit and hopefully they will get a

23    dividend.

24         MR. TAFFET:  But to that point, Your Honor, going

25    back to the issue of is there a way to bang the heads

1    together, get a resolution -- may I add that we did have

2    sessions with Magistrate Judge Gates.  But that was almost

3    two years ago.

4        And since then, when this case sort of resurrected a

5    little bit earlier in the spring, I know we've had

6    communications with Beach Mart's counsel, some, you know --

7                THE COURT:  But you know --

8                MR. TAFFET:  -- the beginnings of discussions.

9    And there may be a way is my --

10                THE COURT:  Yeah, I go under the rubric or

11    whatever you want to call it of, in the law, that the known

12    always is better than the unknown.

13                MR. TAFFET:  Uh-huh.

14                THE COURT:  And this room is the unknown.  And

15    the known is your offices and what you want to come to

16    grips with.  And there's never a situation where rolling

17    the dice and going for the unknown is preferable.  You can

18    live with the known --

19                MR. TAFFET:  Well, Your Honor --

20                THE COURT:  -- because you've fashioned it.

21    That's why it's known.

22                MR. TAFFET:  Right.

23                THE COURT:  I'm not trying to be, you know, smart

24    with you.  I'm just telling you that doing it your way is a

25    lot better than doing it somebody else's way.

1    MR. TAFFET:  And your comments have been told to
2    our clients repeatedly.  And the point that I'm --
3            THE COURT:  There's a breaking point for any
4    client.
5            MR. TAFFET:  I agree.  I totally agree.
6        And my point here is that -- what I was going to say
7    is our client has, L&L Wings has authorized us, if the
8    Court thinks it's appropriate, to go back into the
9    mediation process.  We're happy to do that.  We would say
10   that we don't want to slow it down, slow down the actual
11   schedule.
12           THE COURT:  And I'm not going to send you to
13   mediation.  I don't believe in that.  I believe in, you
14   know, drastic intervention.
15           MR. TAFFET:  Okay.  I guess our --
16           THE COURT:  It's better to be feared than to be
17   loved kind of thing.
18           MR. TAFFET:  My last point is we have a great
19   interest to get this case moving and get --
20           THE COURT:  And get it closed.  Not get it
21   moving.  Moving is counterproductive.  Closure is
22   productive.
23           MR. TAFFET:  You know, one of the things that we
24   talked about -- and we did not put this in the joint
25   statement -- but there is the summary judgment motion that

1  we did make to Judge Fox that was not ruled on on the

2  merits.  He held that it was moot in light of his dismissal

3  without prejudice of the counterclaims.

4      We would be very happy to re-file that motion for

5  summary judgment even as we proceed now if that would be

6  the Court's preference.

7          THE COURT:  I don't know -- I mean, I don't know

8  enough about the case.  But I'm trying to be candid with

9  you because you're not going to enjoy being in this case.

10  It's not an uplifting experience.  And we're going to get

11  closure.  And that's not going to inhibit me.

12      So, you know, again, it sounds like I'm giving you

13  warnings.  I'm not giving you warnings.  I'm being

14  thoroughly candid with you --

15          MR. TAFFET:  I appreciate that.

16          THE COURT:  -- and sharing my mental attitude and

17  approach to it.  This case is going to end.  Anyway.

18      Anything else we need to do?

19      I'm going to get familiar with it.  And I'm going to

20  go through -- ignore what happened before because I am

21  going to ignore it.

22      So, I mean -- and I don't know what you know and I

23  don't know what, you know, your goals are.  Anyway.

24      Do we need to do anything else?

25          MR. TAFFET:  The only question I have with -- do

1    we understand correctly -- Your Honor will issue a

2    scheduling order?

3              THE COURT:  Not really.

4              MR. TAFFET:  Okay.

5              THE COURT:  I mean, I don't even know if I'll do

6    that.  I might just fish around in the case looking for

7    closure and come up with it.

8         What was the name of the peanuts case?  Suffolk -- what

9    was the name of that?

10             THE COURTROOM CLERK:  Severn.

11             THE COURT:  Severn, yes.

12        I had a case -- shouldn't be disclosing trade secrets

13   -- I had a case that was, yes, not as bad as this but like

14   this, involving peanuts and a warehouse with a million

15   bushels of peanuts and fumigators and the warehouse had

16   mold in it.  And if they didn't -- and there was 20 million

17   dollars worth of peanuts in it.  If they didn't get the

18   mold out, they were going to lose it all.

19        Anyway, long story short, they hired an exterminator.

20   The guy came, he did his thing.

21        Peanuts in a closed environment after harvest are

22   volatile.  You may not think so.  But if you -- it's like

23   the old pressure, temperature, volume thing we did in

24   chemistry.  And after a week or two, they started on fire.

25   And then they messed around with them, trying to save the

```
1    peanuts for two, three weeks, maybe 15 or 20 days.  And
2    then it blew up.  And now we have no more peanuts.  And we
3    have 20 million dollars in the lawsuit.
4         So we were going to go to trial in the case.  And one
5    of the smarty lawyers, I told him I would give him so much
6    time on each side.  And this lawyer decided he would file a
7    mandamus petition on me to, imagine that, to the circuit
8    court to tell me how to organize the trial.
9         Well, long story short, I had denied summary judgment.
10   Then I went back, sua sponte, and granted summary judgment
11   which -- and, sure enough, they affirmed.  And so you never
12   know.  I mean, there's no clear path anymore.
13        And, you know, if you do go up, it's, you know, when
14   you show up at 8:30 in the morning for your oral argument,
15   who is on the panel?  I mean, how do you know?
16        And so there's a whole range of variables that come
17   into play in civil litigation.  That's why we don't try any
18   jury cases anymore because of these variables.  And, you
19   know, 40 years ago, it was more predictable and more finite.
20   And now it's not.
21        But, anyway, nice to see you all.
22             MR. BURKE:  Your Honor, one more thing if I
23   could, Your Honor.
24             THE COURT:  Sure.
25             MR. BURKE:  There's also a case, another case
```

1    brought by Penn National against my client.

2             THE COURT:  This is the coverage case?

3             MR. BURKE:  Yes, Your Honor.  And I believe that

4    was noticed --

5             THE COURT:  Is that embedded in this case?

6             MR. BURKE:  I believe it was noticed for this

7    status conference as well today.

8        And I spoke to counsel for Penn National before the

9    hearing started.  We had reached an agreement on how to

10   proceed in that case subject to the Court's approval.

11   So --

12            THE COURT:  What's that?

13            MR. BURKE:  What we had discussed was a -- the

14   case has been stayed.  What we had discussed was agreeing

15   to an additional three-month continuance of that stay.

16       During that time, we're going to have a mediated

17   settlement conference.  We've had some settlement

18   discussions.  We're optimistic that we can get it resolved

19   in that time period.

20       So we would ask the Court to stay it for three months,

21   let us do a mediated settlement conference and try to

22   resolve that action.

23            THE COURT:  What's the coverage issue?  What do

24   they -- you claim they have coverage over something?

25            MR. BURKE:  Yes.

1          THE COURT:  What is it that you say they have

2   coverage over?

3          MR. BURKE:  The claims in this lawsuit.

4          THE COURT:  That they should be prosecuting it?

5   Or --

6          MR. BURKE:  Well, that there's coverage for the

7   claims that have been asserted against my client by L&L

8   Wings in this litigation.

9          THE COURT:  Okay.

10          MR. BURKE:  And then they filed for declaratory

11  judgment that there is no coverage.

12          THE COURT:  Okay.

13          MR. BURKE:  That was stayed during the pendency

14  of the summary judgment motions that were before Judge Fox.

15  I think the stay has been lifted.

16      But, basically, what we just discussed, subject to the

17  Court's approval, is we would continue that stay, not incur

18  the expense of litigation, for us to go have a mediated

19  settlement conference and try and resolve the matter.

20          THE COURT:  I'll look at it.  I'm not going to

21  commit to anything right now.

22          MR. BURKE:  That's fine.  I just wanted to let

23  you know that's what we had discussed.  Thank you.

24          THE COURT:  Okay.  All right.  Thank you.

25      (Proceeding concluded at 2:24 p.m.)

```
 1                        CERTIFICATE

 2

 3            This is to certify that the foregoing transcript

 4    of proceedings, taken at the judicial session of the United

 5    States District Court, is a true and accurate transcription

 6    of the proceedings taken by me in machine shorthand and

 7    transcribed to the best of my ability by computer under my

 8    supervision.

 9            This, the 15th day of March, 2018.

10

11                        /S/   MICHELLE MAAR

12                        Michelle Maar, RDR, RMR, FCRR
                          Official Court Reporter (Inactive)
13

14

15

16

17

18

19

20

21

22

23

24

25
```