IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:11-CV-44-FL

| | | |
|---|---|---|
| BEACH MART, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| L&L WINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on plaintiff's motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a) (DE 484). The issues raised have been briefed fully, and in this posture, are ripe for ruling. For the following reasons, plaintiff's motion is denied.

**STATEMENT OF THE CASE**

This case involves nine years of protracted litigation between two beachwear retailers regarding the trademark "WINGS." The court recounts procedure pertinent to the issues now under consideration.[1]

Plaintiff initiated this action September 9, 2011, and filed amended complaint December 16, 2013, asserting claims of fraudulent inducement to contract, negligent misrepresentation, cancellation of trademark registrations under 15 U.S.C. § 1064, false or fraudulent trademark

---

[1]     As set forth in more detail herein, this case originally was assigned to Senior United States District Judge James C. Fox, and then reassigned to Chief United States District Judge Terrence W. Boyle, before being reassigned to the undersigned on August 28, 2019.

registration under 15 U.S.C. § 1120, unfair and deceptive trade practices, and two requests for declaratory judgment, asserted in the alternative.

During the pendency of this action, defendant commenced an action in the Southern District of New York (the "SDNY action"), which ultimately was transferred to this court and consolidated with the instant action in 2014.[2] In the SDNY action, defendant asserted claims against plaintiff, in pertinent part, for tortious interference with contract and civil conspiracy to tortiously interfere with contract. (2d Am. Compl. (DE 305) ¶¶ 62-74). In its answer to defendant's amended complaint, filed November 13, 2017, plaintiff raised two counterclaims, including the operative counterclaim for trademark cancellation premised upon defendant's "unintentional abandonment of the WINGS trademarks through . . . naked licensing" (hereinafter, the "trademark abandonment counterclaim") (Answer and Counterclaims (DE 325) ¶ 45).

As the case proceeded through discovery, plaintiff alleged defendant withheld certain information, including the existence of a trademark licensing agreement with third-party owner, Shepard Morrow ("Morrow"). Upon plaintiff's motion for sanctions, the court enjoined defendant from "seeking any form of equitable relief from [plaintiff] including but not limited to injunctive relief, disgorgement of profits, or any other equitable defense." (Order (DE 233) at 33).[3]

Thereafter, the parties filed cross motions for summary judgment. As pertinent here, the court granted summary judgment to defendant on plaintiff's trademark abandonment counterclaim, concluding that licensee estoppel barred this counterclaim as a matter of law. On appeal, the United States Court of Appeals for the Fourth Circuit reversed, concluding that

---

[2] Before consolidation into the instant action the SDNY action was designated case No. 2:14-CV-52-F, which case was administratively closed upon consolidation with the instant case on September 15, 2014.

[3] Page numbers in citations to documents in the record specify the page number designated by the court's electronic case filing (ECF) system, and not the page number, if any, showing on the face of the underlying document.

"[b]ecause Judge Fox's sanctions order precludes L&L from asserting a theory of licensee estoppel, we hold that Judge Boyle erred in later granting summary judgment to L&L on that basis." Beach Mart, Inc. v. L&L Wings, Inc., 784 F. App'x 118, 128 (4th Cir. 2019). Accordingly, the Fourth Circuit remanded plaintiff's counterclaim.

Upon remand, the action was reassigned to the undersigned United States District Judge, and the court held a Rule 16 conference February 7, 2020. On February 10, 2020, the court set this matter for trial to commence November 2, 2020,[4] and granted plaintiff "leave to file motion for partial summary judgment, solely on the narrow issue discussed at conference and set forth in the parties' joint status report (DE 448)", concerning whether defendant abandoned its trademark by engaging in naked licensing. (Order (DE 450) at 1).

On March 13, 2020, plaintiff filed the instant motion for partial summary judgment on its trademark abandonment counterclaim, relying upon a memorandum of law, statement of material facts, and appendix of exhibits thereto, comprising the following: 1) deposition of Dror Levy; 2) Eliezer Tabib ("Tabib") license agreement; 3) deposition of Etsion Yacobi ("Yacobi"); 4) Yacobi license agreement; 5) deposition of Zeev Tafel ("Tafel"); 6) Tafel license agreement; 7) deposition of Noah Rosenberg ("Rosenberg"); 8) 2012 deposition of Shaul Levy; 9) 2013 deposition of Shaul Levy; 10) 2008 declaration of Albert Levy; and 11) 2012 deposition of Albert Levy.

---

[4]     The following claims, asserted by plaintiff, and not addressed by this order, remain for trial: 1) fraudulent inducement to contract, 2) negligent misrepresentation, 3) unfair and deceptive trade practices, and 4) false or fraudulent trademark registration, and 5) trademark cancellation. Following remand by the Fourth Circuit, defendant's claims and counterclaims asserted against plaintiff no longer remain. (See DE 233, 411, 438). Defendant's claims against former defendant Morrow were dismissed at summary judgment (DE 409), as were its claims against former defendant Super Wings, LLC ("Super Wings") (DE 411). Ambiguity remains regarding Super Wing's status in the instant matter, where the operative counterclaim for trademark abandonment was raised by plaintiff and Super Wings, yet only plaintiff moved for summary judgment on this counterclaim. As set forth in the conclusion of this order, plaintiff is DIRECTED to show cause, within 14 days of the date of this order, why Super Wings should not be dismissed as a party plaintiff in this matter, for failure to prosecute.

3

Defendant relies in its opposition on its statement of material facts, and the following exhibits, in addition to those relied upon by plaintiff: 1) an order entered in the case L&L Wings, Inc. v. Marco-Destin, Inc., 676 F. Supp. 2d 179 (S.D.N.Y. 2009); 2) U.S. Trademark Registration Number 3,458,114; 3) U.S. Trademark Registration Number 4,193,881; and 4) U.S. Trademark Registration Number 4,205,040.

## STATEMENT OF FACTS

The undisputed facts, and those viewed in the light most favorable to defendant, may be summarized as follows. Defendant, through its principals Shaul Levy and Meir Levy, operates beach accessory stores under the "WINGS" name in South Carolina, North Carolina, Florida, Texas, and California, (see Pl. Stmt. (DE 486) ¶ 1; Def. Opp. Stmt. (DE 503) ¶ 1; Shaul Levy 2012 Dep. (DE 504-1) 16:21-17:8), and it is the record owner federal trademark registrations for the "WINGS" mark. (Pl. Stmt. (DE 486) ¶ 2; Def. Opp. Stmt. (DE 503) ¶ 2). Beginning in or around 1994, defendant granted licenses to certain third parties, allowing them to use the "WINGS" mark, as set forth in more detail below. (Pl. Stmt. (DE 486) ¶ 3; Def. Opp. Stmt. (DE 503) ¶ 3).

1.      Tabib License

In the 1980s, Tabib began working for defendant as a manager of its "WINGS" stores. (Dror Levy (DE 504-3) 52:10-25, 54:5-10; Shaul Levy 2012 Dep. (DE 488-8) 301:5-302:4)  In this capacity, Tabib was defendant's "field guy, the manager, the supplier guy" and he "kind of d[id] [defendant's] guidelines," according to Dror Levy,[5] the Rule 30(b)(6) designee for Tabib's companies. (Dror Levy Dep. (DE 504-3) 55:16-20).

In 1995, Shaul Levy, Meir Levy, and Tabib formed Marco-Destin, Inc., ("Marco-Destin"), a retail management company that operated several "WINGS" stores. (Dror Levy Dep. (DE 504-

---

[5]      Dror Levy joined Marco-Destin in 1999, and he is aware of Marco-Destin's operations prior to 1999 through his study of Marco-Destin's corporate records. (Dror Levy Dep. (DE 504-3) 6:12-23, 48:5-21).

3) 6:6-9; 48:22-49:15; Def. Opp. Stmt. (DE 503) ¶ 7). Shaul Levy, Meir Levy, and Tabib also co-owned: 1) 1000 Highway 98 East Corporation ("Highway"), which functioned as Marco-Destin's landlord, and 2) Panama Surf & Sport, Inc. ("Panama"), a company that provided management consulting services to Marco-Destin. (2009 Order (DE 504-8) 2-4). An affiliated company, E & T, Inc. ("E&T"), which Tabib owned, also operated "WINGS" stores. (2009 Order (DE 504-8) 2-4; Shaul Levy 2012 Dep. (DE 488-8) 303:2-11; Dror Levy Dep. (DE 504-3) 13:17-25). During this time period, defendant granted Marco-Destin, Highway, Panama, and E&T oral licenses to use the "WINGS" mark. (Shaul Levy 2012 Dep. (DE 488-8) 308:18-309:21, 310:1-19).

In 1998, Tabib, Meir Levy, and Shaul Levy amicably decided to divide their businesses. (Shaul Levy 2012 Dep. (DE 488-8) 304:14-24; 2009 Order (DE 504-8) 4). As part of the division, Tabib acquired Shaul Levy's and Meir Levy's ownership interests in Marco-Destin, Highway, and Panama. (Dror Levy Dep (DE 504-3) 49:13-51:23; Tabib License (DE 488-2). In addition, Tabib acquired some of the "WINGS" stores that he previously managed, and defendant granted Tabib a license to use the "WINGS" mark in connection with those stores. (Shaul Levy 2012 Dep. (DE 488-8) 301:15-302:3; Tabib License (DE 488-2).

The license agreement, which was scheduled to terminate on October 31, 2006, required Tabib to maintain at least 66.75 percent ownership in his companies, and it did not permit assignment of the license. (Tabib License (DE 488-2) ¶¶ 1.3, 2, 4.6, 9). The license agreement did not include an express provision regulating the quality of the Martin-Destin's stores and services, nor did it grant defendant the right to monitor or control Martin-Destin's stores and services. (Tabib License (DE 488-2); Pl. Stmt. (DE 486) ¶ 8). Moreover, the license agreement did not require Tabib to provide defendant with any product samples, and defendant never

5

purchased any of Tabib's products for inspection. (Pl. Stmt. (DE 486) ¶ 16; Def. Opp. Stmt (DE 503) ¶ 16).

2.  Yacobi License

In approximately 1985 or 1986, Shaul Levy gave Yacobi his first job in America, hiring him as an assistant manager for one of defendant's "WINGS" stores.  (Yacobi Dep. (DE 504-4) 5:23-6:14, 52:8-53:6).   Ultimately, defendant promoted Yacobi to serve as manager of two of defendant's "WINGS" stores in Myrtle Beach, South Carolina, and four of defendant's "WINGS" stores in Florida. (Yacobi Dep. (DE 488-4 5:23-6:14, 12:5-14:23).   Yacobi also entered into a partnership with defendant, whereby Yacobi and defendant shared profits from certain "WINGS" stores.  (Id. 7:17-21).  During his 16 years of employment with defendant, Yacobi became familiar with defendants' operations, vendors, merchandise, tagging, packaging, advertising, and the use and display of its "WINGS" mark.  (Yacobi Dep. (DE 504-4) 69:2-18).  In fact, when asked whether he was familiar with the manner in which defendant displayed its "WINGS" trademark, Yacobi testified that he was "one of the people who ma[d]e the decision[s].  [He] was one of the buyer[s]. [He] was one of the people who set up to fix the store, [he] was one of the decision-maker[s] too."  (Yacobi Dep. (DE 158-7) 69:24-70:9).  Yacobi also testified that he saw himself as part of "WINGS" brand, and that "we work[ed] very hard to build this name."  (Yacobi Dep. (DE 504-4) 74:21, 77:8-17).

In 2001, defendant granted Yacobi a license to use the "WINGS" mark in connection with a "WINGS" store Yacobi purchased from defendant, which Yacobi formerly managed.  (Pl. Stmt. (DE 486) ¶¶ 18-19; Def. Opp. Stmt. (DE 503) ¶¶ 18-19).  At his deposition, Yacobi testified that, when he entered into the licensing agreement with defendant, "I knew I would respect the Wings

name. Every time I walk by the Wings and I see something wrong, I feel bad." (Def. Opp. Stmt. (DE 503) ¶ 20; Yacobi Dep. (504-4) 74:8-18).

The licensing agreement did not contain any express provisions regarding the quality of Yacobi's store or services, nor did it allow defendant to monitor or control Yacobi's services. (Pl. Stmt. (DE 486) ¶ 19; Def. Opp. Stmt. (DE 503) ¶ 19). Finally, the licensing agreement required Yacobi and his wife to retain full ownership and control of his company and did not permit assignment of the license. (Def. Opp. Stmt. (DE 503) ¶ 19; Yacobi License (DE 488-4)).

3.　　Tafel License

Tafel began working for defendant in 1987 or 1988, as a manager of defendant's "WINGS" store in Myrtle Beach, South Carolina. (Tafel Dep. (DE 488-5) 9:13-10:7, 42:7-43:9). In 1992, Tafel moved to South Padre Island, Texas, where he managed defendant's local "WINGS" store until he acquired the store in 1999. (Id. 42:24-44:9-15). As part of this acquisition, defendant granted Tafel, through Tafel's company, ZT, Inc., a license to use the "WINGS" mark at the newly-acquired store. (Tafel Dep. (DE 488-5) 10:12-23; Def. Opp. Stmt. (DE 503) ¶ 26). The licensing agreement was an arms-length transaction, for which Tafel obtained independent legal counsel. (Pl. Stmt. (DE 486) ¶ 27; Def. Opp. Stmt. (DE 503) ¶ 27).

The licensing agreement did not contain any express quality control provisions, (Pl. Stmt. (DE 486) ¶ 28; Def. Opp. Stmt. (DE 503) ¶ 28), and defendant did not exercise control over Tafel's operations. (Pl. Stmt. (DE 486) ¶ 28; Def. Opp. Stmt. (DE 503) ¶ 28). At his deposition, Tafel testified that when he entered into the licensing agreement, he knew it was important for him to respect and preserve the "WINGS" mark by utilizing similar hangtags, bags, and displays as defendant, and Shaul Levy was aware that Tafel intended to preserve and respect the "WINGS" mark. (Tafel Dep. (DE 488-5) 53:7-54:16; Def. Opp. Stmt. (DE 503) ¶ 26). Moreover, the

7

licensing agreement required Tafel to maintain a 50 percent interest in ZT, Inc., it and did not permit assignment of the license. (Def. Opp. Stmt. (DE 503) ¶ 29; Tafel License ¶¶ 2.1, 4.6, 11).

### 4. Rosenberg License

In either 1983 or 1984, Rosenberg began working for defendant in Myrtle Beach, South Carolina, and continued to work for defendant for 10 or 11 years. (Rosenberg Dep. (DE 504-6) 8:10-19; Def. Opp. Stmt. (DE 503) ¶ 37). Rosenberg performed various jobs for defendant, such as acquiring real estate, working in defendant's warehouse, and distributing a "WINGS" suntan lotion line. (Rosenberg Dep (DE 504-6) 27:2-28:1). Rosenberg also worked in defendant's "WINGS" stores, stocking, printing, displaying, tagging, bagging, and selling the merchandise. (Id. 44:5-19; 27:14-28:1). Although Rosenberg never served as an assistant manager or general manager of a "WINGS" store, he testified that he "knew everything about the store." (Id. 28:18-20).

In 1994 or 1995, Rosenberg opened his own "WINGS" store in Sarasota, Florida. (Id. 13:3-15; 14:15-15:14). Rosenberg testified that he had a mutual understanding with Shaul Levy that he would run the "WINGS" store in Sarasota in the same manner that defendant ran its stores. (Id. 50:22-52:9). A written license agreement, signed by Shaul Levy and Rosenberg, limited Rosenberg's use of the "WINGS" mark to his store in Sarasota, Florida, and stated that the license would terminate if Rosenberg opened another store.[6] (See Rosenberg License (DE 180-5)).

---

[6] On December 11, 2013, plaintiff filed notice, indicating that it received several untimely disclosures from defendant, including a written license agreement signed by Shaul Levy and Rosenberg. (See Notice (DE 180) at 3). Although neither party attached this document as an exhibit to their briefing of the instant motion, plaintiff cites to this document. (See Pl. Reply (DE 519) at 4). Moreover, the court may properly consider the document in its address of the instant motion because it is part of the record. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

8

5.     Hemmo License

Hemmo managed some of defendant's "WINGS" stores and eventually started operating his own "WINGS" stores. (Shaul Levy 2013 Dep. (DE 504-2) 117:16-22). A license agreement, signed by Hemmo and Shaul Levy on January 1, 1998, allowed Hemmo to use the "WINGS" mark at his store in Surfside Beach, South Carolina, until December 31, 1999, as long as Hemmo maintained a controlling interest in the store. (See Hemmo License (DE 180-1)).[7] The agreement specifically limited Hemmo's use of the "WINGS" mark to the store in Surfside Beach. Id. Moreover, it prohibited assignment of the license, and indicated that the license shall terminate automatically if Hemmo leased the store to anyone. Id.

Additional facts pertinent to the instant motion will be discussed below.

## COURT'S DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry

---

[7]     This license agreement was also attached to plaintiff's December 11, 2013, notice.

of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."  Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489-90.

B.     Analysis

Plaintiff argues defendant abandoned its rights to the "WINGS" mark by engaging in naked licensing.  As the Fourth Circuit explained in remanding the instant case, "'[n]aked licensing' occurs when the licensor fails to exercise adequate quality control over the licensee." Beach Mart, Inc., 784 F. App'x at 127 (citing FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 515 (9th Cir. 2010)). [8]  This practice "may cause the trademark to stop functioning as a symbol of quality and a controlled source." Id.  Accordingly, "[i]n such a case, the court may find that the trademark has been abandoned and that cancellation of the trademark's registration is appropriate." Id. (citing Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc., 289 F.3d 589, 598 (9th Cir. 2002); Restatement (Third) of Unfair Competition § 33 (Am. Law Inst. 1995); 15 U.S.C. § 1064(3); and 15 U.S.C. § 1119).  However, "[b]ecause a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1985).

Although the Fourth Circuit has not determined standards for evaluating such a claim, the United States Court of Appeals for the Ninth Circuit has held that "[w]hen deciding summary judgment on claims of naked licensing, [the court] first determine[s] whether the license contained an express contractual right to inspect and supervise the licensee's operations." FreecycleSunnyvale, 626 F.3d at 516 (citing Barcamerica, 289 F.3d at 596).  However, "[t]he lack of an express contract right to inspect and supervise a licensee's operations is not conclusive evidence of lack of control." Barcamerica, 289 F.3d at 596.   Indeed, "[t]here need not be formal

---

[8]     Although the Fourth Circuit defined naked licensing, it never reached the question of whether defendant actually engaged in naked licensing.  See Beach Mart, Inc., 784 F. App'x at 127.  In addition, the Fourth Circuit has not explicitly addressed naked licensing in any other opinion.  See e.g., Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1047 (4th Cir. 1984) ("This rule of uncontrolled licensing of a trademark is inapplicable to the instant case as no evidence of licensing has been presented.").  Accordingly, the court must look to other circuits for guidance on this issue.

11

quality control where the particular circumstances of the licensing arrangement indicate that the public will not be deceived." Id. (internal quotations and citations omitted). Accordingly, courts have upheld licensing agreements where the "licensor demonstrated actual control through inspection or supervision." FreecycleSunnyvale, 626 F.3d at 516–17 (emphasis in original). In addition, courts have upheld licensing agreements where the licensor and licensee were in a "close working relationship" such that the licensor could rely upon the licensee's own quality control efforts. Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir.1991).

Importantly, "it is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees." Barcamerica, 289 F.3d at 598 (internal quotations and citations omitted). Therefore, "the standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." Id. And "[w]here the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, [the court] need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions." Taco Cabana, 932 F.2d at 1121.

Based on the foregoing principles of law, the court will address each of defendant's licensing agreements, in turn.

1.      Tabib License

It is undisputed that defendant's licensing agreement with Tabib lacked any provision granting defendant the right to control or inspect Tabib's retail operations. (Tabib License (DE 488-2); Pl. Stmt. (DE 486) ¶ 8; Def Opp. Stmt. (DE 503) ¶ 8). Regarding actual control, Shaul Levy testified that he did not inspect or supervise Tabib's "WINGS" stores. (Shaul Levy 2012

Dep. (DE 488-8) 307:9-13). However, Albert Levy, Shaul Levy's son and manager of defendant's "WINGS" stores, testified that he visited "WINGS" stores owned by Marco-Destin, and thus Tabib, to monitor them because they used the name "WINGS." (Albert Levy Dep. (DE 504-7) 114:13-115:20).

Plaintiff argues that Albert Levy's testimony cannot create a genuine issue of material fact regarding whether defendant inspected Tabib's "WINGS" stores because it contradicts the testimony of defendant's corporate designee, Shaul Levy. In support, plaintiff cites to Rohrbough v. Wyeth Lab., Inc., 916 F.2d 970, 976 (4th Cir. 1990) and Barwick v. Celtex Corp., 736 2.d 946, 960 (4th Cir. 1984), cases in which the Fourth Circuit held that a party cannot create a genuine issue of fact by contradicting its own prior testimony.

However, Albert Levy's testimony does not contradict Shaul Levy's testimony. At his deposition, Shaul Levy was asked if he personally ever inspected Tabib's stores, not whether anyone employed by defendant inspected Tabib's stores. (See Shaul Levy 2012 Dep (DE 488-8) 307:9-13). This question is in contrast to other portions of Shaul Levy's deposition, where he was asked if anyone employed by defendant inspected "WINGS" stores owned by other licensees. See e.g., Shaul Levy 2012 Dep (DE 488-8) 326:10-13 ("Has anyone at L&L Wings ever tried to control the quality of products sold by Mr. Tafel's company?") (emphasis added). Thus, when Albert Levy testified that he inspected Tabib's stores, he did not contradict Shaul Levy's testimony, as Shaul Levy was never asked about Albert Levy or defendant's other employees with regard to Tabib's stores.

In addition, the evidence reflects that defendant relied on Tabib as a longtime employee and business partner to maintain a certain level of quality in the "WINGS" stores. Indeed, defendant's relationship with Tabib spanned approximately 15 years, beginning with Tabib's role

13

as manager of defendant's "WINGS" stores. (Dror Levy (DE 504-3) 52:10-25, 54:5-10; Shaul Levy 2012 Dep. (DE 488-8) 301:5-23). During this time, Tabib was intimately involved with defendant's "WINGS" operations, in light of testimony that Tabib was defendant's "field guy, the manager, the supplier guy" and he "kind of d[id] [defendant's] guidelines." (Dror Levy Dep. (DE 504-3) 55:16-20). Finally, evincing defendant's reliance on Tabib for quality control, the license agreement required Tabib to possess at least a 66.75 percent interest in his companies and prohibited assignment. (See Tabib License (DE 488-2) ¶¶ 2, 4.6, 9).

Accordingly, defendant's relationship with Tabib resembles the license parties' relationship in Taco Cabana, 932 F.2d at 1121. In that case, two brothers, who operated Taco Cabana restaurants together for eight years, decided to divide their business and split the restaurants between them. Id. at 1121-22. As part of the division, the brothers entered into a cross-license arrangement, allowing both brothers to continue to use the same trade dress at their respective restaurants. Id. Addressing the claim that the cross-license was a naked license, the Fifth Circuit held:

> Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities.

> Id. at 1121.

Here, as in Taco Cabana, defendant and Tabib jointly operated "WINGS" stores as partners and eventually divided the stores between them. (Shaul Levy 2012 Dep. (DE 504-1) 301:5-14). Although Tabib was not related to either Shaul or Meir Levy, his professional relationship with defendant spanned 15 years, which is twice as long as the professional relationship in Taco Cabana. Thus, as in Taco Cabana, the evidence here suggests that defendant could rely on Tabib to maintain

14

consistent quality, in light of Tabib's intimacy with defendant's standards and procedures, some of which Tabib developed himself.

Plaintiff argues that Tabib and defendant did not have a close working relationship, citing litigation between them. However, the evidence shows there was "great trust" between defendant and Tabib while the license was in effect, and defendant and Tabib did not engage in litigation until after the license terminated. (See Def. Resp. (DE 502) at 5; Dror Levy Dep. (DE 504-3) 92:14-23, 106:10-16; 117:2-12; 122:12-16). While post-license litigation between Tabib and defendant may be indicative of the nature of their relationship, the court finds that defendant has shown a genuine dispute of material fact as to whether there was a "close working relationship" between defendant and Tabib during the relevant licensing period.[9]

Plaintiff also argues that the complaints Albert Levy received about Marco-Destin's "WINGS" stores evidence a lack of control by defendant over Tabib. However, Albert Levy stated in his 2008 declaration that these complaints were made after defendant's license agreement with Tabib terminated. (See Albert Levy Decl. (488-10) ¶ 6). Moreover, Shaul Levy testified that some of the complaints, such as an odor from dead hermit crabs left on display, occurred in his "WINGS" stores as well. (Shaul Levy 2013 Dep (504-2) 95:8-14). Importantly, as the Ninth Circuit explained:

> "quality control" does not necessarily mean that the licensed goods or services must be of "high" quality, but merely of equal quality, whether that quality is high, low or middle. The point is that customers are entitled to assume that the nature and quality of goods and services sold under the mark at all licensed outlets will be consistent and predictable.

---

[9] Plaintiff also argues that Tabib was not a former employee of defendant, citing to page 300, line 5, through page 304, line 12 of Shaul Levy's May 2, 2012, deposition. (See Reply (DE 512) at 5). However, the cited portion of Shaul Levy's deposition suggests that Tabib served as defendant's employee and a business partner. (See Shaul Levy 2012 Dep. (DE 488-8) 300:14-16) ("[Tabib and I] had an employment agreement and a partnership on some of the stores and that Eli [Tabib] was working with me."); (Id. 301:11-12) ("[Tabib] was a part employee and part, he had partnership."); (Id. 301:23-25) ("[Tabib] used to manage all of North Carolina stores and all of those other stores."). Moreover, Tabib's status as former employee is not material to this inquiry, as the brothers in Taco Cabana were not former employees of each other. 932 F.2d at 1121.

15

<u>Barcamerica</u>, 289 F.3d at 598.  Accordingly, such complaints, where similar, are not conclusive evidence of a lack of control.

    2.    Yacobi License

    As with Tabib's license, the license defendant granted to Yacobi lacked an express quality control provision and did not grant defendant the right to monitor or control the quality of Yacobi's stores.  (Pl. Stmt. (DE 486) ¶ 19; Def. Opp. Stmt (DE 503) ¶ 19).

    Regarding actual control, plaintiff argues defendant did not control or supervise Yacobi's retail operations, highlighting testimony that defendant did not restrict the types of goods Yacobi sold or the manner in which Yacobi displayed the "WINGS" trademark.  (Yacobi Dep. (DE 158-7) 88:2-11).  However, defendant proffers testimony that Shaul Levy and Albert Levy visited Yacobi's "WINGS" store approximately twice a year, evidencing inspection.  (Yacobi Dep. (DE 504-4) 88:2-11).  While such visits, alone, do not defeat a claim of naked licensing, the evidence, viewed in the light most favorable to defendant, reflects that Yacobi had a close working relationship with Shaul Levy, such that defendant could rely on Yacobi to maintain consistent quality.  (Yacobi Dep. (504-4) 52:8-53:6).  Indeed, Yacobi testified, "I knew I would respect the Wings name. Every time I walk by the Wings and I see something wrong, I feel bad."  (Yacobi Dep. (504-4) 74:8-18).   Yacobi also testified that he saw himself as part of "WINGS" brand, and that "we work very hard to build this name."  (Yacobi Dep. (504-4) 74:21, 77:8-17).

    Moreover, through his experience as an employee, business partner, and manager of defendant's stores, Yacobi became familiar with defendants' operations, vendors, merchandise, tagging, packaging, advertising, and the use and display of its "WINGS" mark.  (Yacobi Dep. (504-4) 69:2-18; Yacobi Dep. (488-4) 5:23-6:14, 12:5-13:33, 14:8-23).   Likewise, the licensing agreement required Yacobi and his wife to retain full ownership and control of his company and

did not permit assignment of the license, evidencing defendant's reliance on Yacobi to maintain consistent quality.  (Pl. Ex. D. (DE 488-4)).

In light of evidence suggesting defendant enjoyed a close working relationship with Yacobi, which spanned 16 years, defendant has raised a genuine issue of material fact as to whether it justifiably relied on Yacobi's "intimacy with standards and procedures to ensure consistent quality."  See Taco Cabana, 932 F.2d at 1121.  Although Yacobi is not related to Shaul or Meir Levy, as the license parties were related in Taco Cabana, Yacobi worked with Shaul and Meir Levy for 16 years, which is twice as long as the license parties' working relationship in Taco Cabana.  (See Def. Opp. Stmt. (DE 503) ¶ 19; Yacobi Dep. (504-4) 69:2-18).

Plaintiff argues defendant's relationship with Yacobi was adversarial and terminated in litigation.  However, the evidence viewed in the light most favorable to defendant reflects that Yacobi had a close, trusting relationship with defendant during the pendency of the license agreement.  (See Yacobi Dep. (DE 504-4) 93:7-8) ("[Shaul Levy] was very kind.  He was very understanding."); (Id. 76:8-11) ("[Shaul Levy] asked me for help, I feel like I'm helping him.  And I really care for this business, for the Wings, and he came and I care for it, something about him so much."); (Id. 73:10-13) ("[Shaul Levy] have no reason not to trust me.  We know each other for a long time.  There was no reason.  I never ever lied to him, never ever cheat him.").  Moreover, the litigation did not commence until after Yacobi sold his "WINGS" store. (Yacobi Dep. (DE 504-4) 111:2-9).  While the post-license litigation may be relevant to the nature of defendant's relationship with Yacobi when the license was granted, defendant has raised a genuine dispute of fact as to whether it had a close working relationship with Yacobi.

3. Tafel License

Defendant's license agreement with Tafel lacked an express quality control provision. (Def. Opp. Stmt. (DE 503) ¶ 27). Regarding actual control, defendant did not put forth any evidence indicating that it inspected or monitored Tafel's retail operations; nor has defendant shown that it limited the products Tafel sold or the manner in which Tafel used or displayed the "WINGS" mark.

Instead, the evidence suggests that defendant relied on Tafel as a trusted former employee to maintain a certain level of quality. Indeed, Tafel had worked for defendant for over 12 years when they entered into the license agreement, and Tafel managed defendant's "WINGS" store in South Padre Island, Texas, for seven years prior to purchasing it in November 1999. (See Tafel Dep. (DE 504-5) 24:6-13, Tafel Dep. (DE 488-5) 44:8-15). Thus, Tafel was familiar with the manner in which defendant operated its stores.

In addition, Tafel testified that it was important for him to respect and preserve the "WINGS" mark by utilizing similar hangtags, bags, and displays as defendant. (Tafel Dep. (DE 488-5) 53:7-54:16; Def. Opp. Stmt. (DE 503) ¶ 26). Finally, the licensing agreement required Tafel to maintain a 50 percent interest in his company ZT, Inc., and it did not permit assignment of the license. (Def. Opp. Stmt. (DE 503) ¶ 29; Tafel License ¶¶ 2.1, 4.6, 11). Accordingly, defendant has put forth evidence to raise a genuine issue of material fact as to whether it relied justifiably on Tafel's "intimacy with standards and procedures to ensure consistent quality."[10] See Taco Cabana, 932 F.2d at 1121.

---

[10] Plaintiff highlights that the licensing agreement was an arms-length transaction for which Tafel retained independent counsel. Notwithstanding Tafel's decision to retain counsel for the transaction, the evidence viewed in the light most favorable to defendant suggests that Tafel's relationship with Shaul Levy was one of respect and trust. (See Tafel Dep. (DE 488-5) 50:12-51:20).

18

4. Rosenberg License

As with defendant's other license agreements, its license agreement with Rosenberg did not include an express provision allowing defendant to inspect or supervise Rosenberg's retail operations. (See Rosenberg License (DE 180-5)).

Regarding actual control, Rosenberg testified that Shaul Levy visited him "from time to time" at his store in Sarasota, Florida, to discuss how Rosenberg operated his store. (Rosenberg Dep. (DE 504-6) 73:25-74:16). During these meetings, Shaul Levy offered him suggestions, and their conversations were "pretty smooth." (Id. 74:14-16). Although defendant never published any standards or requirements for Rosenberg to follow when operating his "WING" store, Rosenberg had an understanding with Shaul Levy that he would stock the same merchandise as defendant, utilize the same packaging, and run the store in the same manner that defendant ran its "WINGS" stores. (Id. 51:15-53:1). Indeed, Rosenberg testified that he purchased his merchandise from most of the same vendors as defendant, although he did "venture a little bit." (Id. 54:6-24). Moreover, Rosenberg used the same types of bags that defendant used, and he purchased those bags from the same source as defendant. (Id. 56:12-20). Finally, the signage Rosenberg used at his "WINGS" store displayed the "WINGS" mark in the same manner that defendant's signage displayed the mark. (Id. 56:21-57:6).

In addition, defendant has put forth evidence suggesting it had a close working relationship with Rosenberg, such that defendant could rely on Tafel's "intimacy with standards and procedures to ensure consistent quality." See Taco Cabana, 932 F.2d at 1121. Indeed, Rosenberg worked for defendant for ten years, performing various functions, such as acquiring real estate for "WINGS" stores, working in "WINGS" warehouses, building and designing "WINGS" stores, and setting up signage. (Rosenberg Dep. (DE 504-6) 8:10-19, 26:18-27:19, 45:3-13; 35:23-25). Rosenberg also

worked in defendant's "WINGS" stores, stocking, displaying, tagging, selling, and bagging the merchandise, and he knew "everything about the store." (Id. 27:19-28:1, 44:5-16). Finally, Rosenberg traveled with Shaul Levy to open "WINGS" stores throughout America, he vacationed with Shaul Levy's family, and he trusted Shaul Levy "very deeply." (Id. 46:1-24, 47:14-19).

In opposition, plaintiff places great weight on the fact that Rosenberg never managed one of defendant's "WINGS" stores prior to opening his own store. Notwithstanding Rosenberg's lack of managerial experience, defendant has raised a genuine issue of material fact regarding whether it reasonably relied on Rosenberg to maintain consistent quality, in light of its close working relationship with Rosenberg.

5. Hemmo License

Pursuant to a written license agreement, defendant allowed Hemmo to use the "WINGS" mark at his store in Surfside Beach, South Carolina from January 1, 1998, until December 31, 1999, as long as Hemmo and his wife maintained a controlling interest in the store.[11] (See Hemmo License (DE 180-1)). The agreement specifically limited Hemmo's use of the "WINGS" mark to the store in Surfside Beach. Id. Moreover, it prohibited assignment of the license, and indicated that the license would terminate automatically if Hemmo leased the store to anyone. Id.

The written license agreement did not provide defendant with the right to inspect or supervise Hemmo's retail operations. However, as stated previously, "[t]he lack of an express contract right to inspect and supervise a licensee's operations is not conclusive evidence of lack of

---

[11]     Plaintiff asserts that Hemmo operated at least one or more independent "WINGS" stores in South Carolina from 2002 until 2010 pursuant to an oral license granted by defendant. (Pl. Stmt. (DE 486) ¶ 41). In support, plaintiff cites to pages 118 and 119 of Shaul Levy's August 15, 2013, deposition. See id. However, the cited portion indicates that Hemmo was a store manager for defendant and "at some point Hemmo began running his own 'WINGS' stores." (Shaul Levy 2013 Dep. (DE 504-2) 117:14-22). When asked if he gave Hemmo permission to use the "WINGS" mark in his stores, Shaul Levy testified that he didn't remember. (Id. 117:23-118:22). Hemmo did not appear for his deposition, so Hemmo's position on this issue is unknown.

control." Barcamerica, 289 F.3d at 596. Here, plaintiff has not presented any evidence suggesting defendant failed to exercise actual control over Hemmo's retail operations or that defendant and Hemmo lacked a close working relationship. Indeed, according to Shaul Levy's testimony, Hemmo was a former manager of defendant's "WINGS" stores, who would have been familiar with defendant's retail operations by virtue of his position. Thus, plaintiff has not met its burden to show a naked license with respect to Hemmo.

Considering the evidence as a whole, defendant granted licenses to trusted former employees, managers, and business partners, who operated "WINGS" stores under defendant's guidance for many years, and relied on the licensees' familiarity with defendant's retail operations to maintain a consistent level of quality. Plaintiff cites FreecycleSunnyvale for the principle that "sole reliance on a licensee's own control quality efforts is not enough to overcome a finding of naked licensing." 626 F.3d at 519. However, the instant case is distinguishable from FreecycleSunnyvale, where the licensor in FreecycleSunnyvale did not allege a "close working relationship" with its licensee. See FreecycleSunnyvale, 626 F.3d at 519 ("Because sole reliance on a licensee's own control quality efforts is not enough to overcome a finding of naked licensing without other indicia of control, and because TFN lacked a close working relationship with FS and failed to show any other indicia of actual control, we conclude that TFN could not rely solely on FS's own quality control efforts.").

Moreover, here defendant has put forth other indicia of control, such as Albert Levy's inspection of Tabib's "WINGS" stores (Albert Levy Dep. (DE 504-7) 114:13-115:20), Albert Levy and Shaul Levy's visits to Yacobi's "WINGS" stores, (Yacobi Dep. (DE 504-4) 88:2-11), and Shaul Levy's visits to Rosenberg's "WINGS" stores. (Rosenberg Dep. (DE 504-6) 73:25-74:16). Shaul Levy also testified that defendant's licensees purchased merchandise from

defendant for the first couple of years, and later purchased from the same vendors as defendant. (Shaul Levy 2013 Dep. (DE 504-2) 149:18-25). Importantly, where a licensee obtains its merchandise from its licensor, or from the same vendors as the licensor, the licensor is able to utilize its own quality control mechanisms over the merchandise, and thus, the trademark. See Transgo, 768 F.2d at 1017 ("At least 90% of the components sold by [the licensee] were manufactured by [the licensor]. On these products, [the licensor] utilized its own quality control procedures at its plant.").

Thus, while defendant's licensing agreements did not contain formal control provisions, and defendant did not closely monitor its licensees' businesses, the degree of control required to defeat naked licensing claim varies among licensing situations. See Barcamerica, 289 F.3d at 598 ("The standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace."). And here, where defendant granted licenses to trusted former employees, managers, and business partners, who had been operating defendant's "WINGS" stores for years, and where defendant's licensees obtained their merchandise from defendant and defendant's vendors, the court declines to "elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions." Taco Cabana, 932 F.2d at 1121.

In sum, viewing the evidence in light most favorable to defendant, and considering the high burden of proof to demonstrate abandonment, the court concludes that defendant has demonstrated a genuine issue of material fact as to whether defendant abandoned the "WINGS" trademark based on naked licensing.[12] Accordingly, plaintiff's motion for summary judgment is denied.

---

[12] Having determined that defendant raised a genuine issue of material fact as to whether it abandoned the "WINGS" mark, the court does not reach plaintiff's request to cancel defendant's trademark registrations and enjoin defendant from registering the mark in the future.

**CONCLUSION**

Based on the foregoing, plaintiff's motion for partial summary judgment (DE 484) is DENIED.  In addition, in accordance with footnote four herein, plaintiff is DIRECTED to show cause, within **14 days** of the date of this order, why Super Wings should not be dismissed as a party plaintiff in this matter, for failure to prosecute.  Defendant may file a reply to plaintiff's response, if any, within **10 days** of plaintiff's response.

SO ORDERED, this the 25th day of August, 2020.

LOUISE W. FLANAGAN
United States District Judge